PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

VAN CLEVE ASHLEY, a/k/a Q,

*Defendant-Appellant.*

No. 08-4015

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Marvin J. Garbis, Senior District Judge.
(1:06-cr-00034-MJG-1)

Argued: March 25, 2010

Decided: June 1, 2010

Before WILKINSON and MOTZ, Circuit Judges, and
Joseph R. GOODWIN, Chief United States District Judge
for the Southern District of West Virginia,
sitting by designation.

Affirmed by published opinion. Judge Wilkinson wrote the
opinion, in which Judge Motz and Judge Goodwin joined.

## COUNSEL

**ARGUED**: Andrew Howard Baida, ROSENBERG, MAR-
TIN, GREENBERG, LLP, Baltimore, Maryland, for Appel-

lant. Christopher John Romano, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

## OPINION

WILKINSON, Circuit Judge:

Van Cleve Ashley was indicted on three federal charges in connection with his efforts to have a government informant and witness murdered. A jury convicted him on all three counts and he now appeals from two of those convictions. Because each of Ashley's claims on appeal is without merit, we affirm his convictions.

### I.

Ashley's convictions arise out of the attempted murder of one Thomas Dixon, a drug dealer turned government informant. Ashley's role was essentially that of a broker, orchestrating a deal between Frank Caruso, a drug dealer whose arrest Dixon had facilitated, and Ramaine "Ra-Ra" York, who was hired to kill Dixon.

The story begins on November 14, 2000, with the arrest of Dixon by members of a federal drug task force working in the Baltimore area. Dixon was carrying more than a million dollars' worth of ecstasy pills. Faced with serious penalties, he immediately agreed to cooperate with federal investigators. The very day of his arrest, Dixon let the government record telephone conversations between him and Caruso, his supplier. Caruso later testified that he came to suspect Dixon was working with investigators during the calls and that his suspicions were confirmed the next day when he learned of Dixon's arrest. His intuitions notwithstanding, Caruso was arrested on federal drug charges in June 2001.

Caruso thereafter hired an attorney who, as it happened, also represented Ashley. Caruso would later testify that he met Ashley for the first time at their attorney's office when Ashley overheard Caruso complaining about Dixon. Ashley approached Caruso, saying that he might know someone with connections to Dixon. Caruso responded that he "would love to be able to discredit, you know, dismantle a witness against me. He's out there selling drugs and living a normal life." Ashley reiterated that he might know someone who could help. Following this initial encounter, Caruso and Ashley had several subsequent discussions and became, as Caruso put it, "friendly."

At some point during a meeting at their attorney's office, Caruso provided Ashley the file kept on his case. It is unclear whether this occurred before or after Caruso had received discovery from the government, which definitively revealed Dixon's role in bringing about his arrest. Caruso also gave Ashley a picture of Dixon, directions to Dixon's home, and a Glock 9mm semiautomatic handgun. In early 2002, Ashley met with York, a long-time associate, telling him that Caruso "had a problem down in Baltimore." On February 24, 2002, York travelled to Baltimore, found Dixon in front of his home, and shot him about six times. Dixon was hospitalized for several months and underwent more than sixty operations but miraculously survived the attack, albeit with permanently debilitating injuries. For these efforts, Caruso paid Ashley $10,000, half of which Ashley passed on to York.

The scheme eventually came to light, and Caruso was charged with retaliating against a federal informant under 18 U.S.C. § 1513(a)(1), while York was charged with conspiracy to retaliate. Both pled guilty. In January 2006, a federal grand jury indicted Ashley on three counts. Count One charged Ashley with conspiring to kill a witness in order to prevent his attendance in court proceedings, in violation of 18 U.S.C. §§ 1512(a)(1)(A) and (k). Count Two charged Ashley with conspiring to kill an informant in retaliation for providing

information to a law enforcement officer, in violation of 18 U.S.C. §§ 1513(a)(1)(B) and (e). Count Three charged Ashley with the firearms offense set forth in 18 U.S.C. § 924(c).

Ashley was convicted on all three counts. He does not appeal his witness tampering conviction, but he does appeal his conviction on the retaliation and firearms charges, claiming insufficient evidence on Count Two and a constructive amendment of the indictment on Count Three.

## II.

We begin with Ashley's sufficiency of the evidence claim on Count Two. His task here is a daunting one. In assessing a sufficiency challenge, a reviewing court must uphold a jury's verdict "if there is substantial evidence, taking the view most favorable to the Government, to support it." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc). "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Id.* A defendant bringing a sufficiency challenge bears "a heavy burden." *United States v. Hoyte*, 51 F.3d 1239, 1245 (4th Cir. 1995). The government must be given the benefit of every reasonable inference. *Id.* Reversal for insufficient evidence is reserved for "the rare case where the prosecution's failure is clear." *United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997) (citation and internal quotation marks omitted).

Count Two charged Ashley with conspiring to violate 18 U.S.C. § 1513(a)(1)(B), which punishes anyone who "kills or attempts to kill another person with intent to retaliate against any person for . . . providing to a law enforcement officer any information relating to the commission . . . of a Federal offense." 18 U.S.C. § 1513(a)(1)(B). The term "law enforcement officer" refers to federal officers. 18 U.S.C. § 1515(a)(4). Ashley argues that the government failed to produce evidence that he had the requisite state of mind to sus-

tain a conviction under the provision. *See United States v. Feola*, 420 U.S. 671, 686 (1975). He asserts there was no evidence he knew Caruso's purpose in having Dixon killed was to retaliate against Dixon for giving information to law enforcement. More specifically, he claims there was no evidence he even knew Dixon was a government informant and that, even if there was, there was no indication he knew the law enforcement officers to whom Dixon had provided information were federal officers.[1]

Ashley makes much of the fact that the government failed to establish whether Caruso had already received discovery from the government at the time he gave Ashley his case file. But this is a red herring. There was ample evidence that Caruso knew Dixon had provided information to federal agents even before discovery took place. Caruso testified that he "had a very good feeling" that Dixon had been cooperating within a day of Dixon's having been arrested. According to Caruso, after Dixon's arrest "there were several phone calls made to me from Tom Dixon from a, I guess it would be, an FBI phone, and he tried to draw me out to say certain things on the phone."

This statement would have allowed the jury to conclude not only that Caruso suspected Dixon was cooperating but that Caruso suspected he was cooperating in a federal investigation, especially since Caruso was later arrested on federal charges. Nor was there anything unreasonable in inferring that Caruso's file, assembled in connection with his upcoming federal prosecution, reflected his view of the sources and origins of his predicament, including its federal aspects. We also reject Ashley's claim that the government was required to offer direct evidence that Ashley read the file. It seems

---

[1]We shall assume for purposes of argument that Ashley is correct that Section 1513 requires that a defendant know that the officer with whom an informant is communicating is a federal one. *See United States v. Denham*, 663 F.Supp.2d 561, 566-71 (E.D. Ky. 2009).

entirely reasonable to suppose that he was given the file so that he could read it and that he naturally did so. After all, Ashley was provided the case file after he had volunteered to Caruso that he could help.

If the case file weren't enough, these inferences find support from other evidence in the record. Both Caruso and York testified that they had pled guilty to federal retaliation charges. Since Ashley was the link between them, the jury could reason that he shared their state of mind. Caruso told Ashley he wanted to "dismantle a witness against me. He's out there selling drugs and living a normal life." A jury could infer that Caruso was upset that Dixon was "leading a normal life" because Dixon had traded information in exchange for his liberty. Caruso also testified that he had not one, but a number of conversations with Ashley about the matter and that "we became friendly," making it all the more likely Ashley understood exactly what the planned assassination of Dixon was all about. Moreover, Caruso did not give Ashley a picture of Dixon, directions to his home, and a semiautomatic handgun in order to foster amicable relations between the two. As Caruso testified, he gave Ashley the gun "[t]o do whatever he had to do to help me with my case."

We note too that the district court clearly pointed out the difference between tampering with witnesses and retaliation against informants in its instructions to the jury, telling it that "in the one case, the allegation is the intent of the conspiracy was to prevent testimony," while in the other, "the intent of the conspiracy is to retaliate for having provided information." The district court also drew attention to the federal dimension of the charge, instructing the jury that to find Ashley guilty, it must determine that Ashley acted "with specific intent to retaliate against Mr. Dixon for providing to law enforcement officers information about the criminal activities of Fred Caruso in the case of *U.S. v. Fred Caruso*," which it had described a moment earlier as "an official federal proceeding."

We are mindful that retaliation against informants and witness tampering are distinct offenses. While the difference between them should not be blurred, the two offenses are often related. Providing information and serving as a witness often go hand-in-hand, and the proof used to support a conviction on one offense will frequently underlie a conviction on another, notwithstanding the differences between the two statutes. In *United States v. Brown*, 937 F.2d 32, 37 (2d Cir. 1991), for instance, the court rejected the defendant's suggestion that his threat to "erase" an informant demonstrated only an intent to prevent a witness from testifying and not to retaliate against an individual for having informed against him. *Id.* at 37. The same holds for the desire to "dismantle" Dixon.

In short, the evidence here satisfied constitutional requirements. Ashley's argument seems premised on the view that juries cannot draw reasonable inferences, but that is precisely what juries are empanelled to do. Though a jury may not convict on the basis of "rank speculation," it is entitled to deduce and to infer. *Goldsmith v. Witkowski*, 981 F.2d 697, 703 (4th Cir. 1992). Our system of lay juries is designed to allow jurors to draw upon common experience and to rely upon reasonable intuitions, and it is not the province of an appellate court to undermine these virtues by picking apart a properly instructed verdict. "[W]hile it is important that we not permit a verdict based solely on the piling of inference upon inference, it is also imperative that we not rend the fabric of evidence and examine each shred in isolation." *United States v. Johnson*, 903 F.2d 1084, 1087 (7th Cir. 1990) (upholding retaliation conviction under § 1513(a)).

Here the "fabric of the evidence" supports the jury's decision. Given the contacts between Caruso and Ashley, it seems entirely reasonable to posit that Ashley knew exactly what Caruso was willing to pay for and precisely what Caruso wanted done. Retaliation against informants, like witness tampering, strikes at the heart of our criminal justice system. It not only disrupts the peace of the community but threatens the

very instruments by which that peace is maintained. Direct evidence of retaliatory intent is "usually unavailable" to prosecuting attorneys. *Id.* But "[i]n a case of witness retaliation, the government need not adduce direct evidence of Appellant's knowledge of a witness's informant status in order for the jury to infer his intent to retaliate." *Brown*, 937 F.2d at 36. In prior retaliation prosecutions, we have not required the government to produce a "smoking gun" that explicitly reveals the contents of defendant's mind, *see United States v. Cofield*, 11 F.3d 413, 419-20 (4th Cir. 1993), and we decline to do so today.

## III.

We turn now to Ashley's contention that the grand jury's charge on Count Three, which charged Ashley with violating 18 U.S.C. § 924(c), was constructively amended.[2] The indictment alleged that Ashley:

> during and in relation to crimes of violence for which he may be prosecuted in a court of the United States, to wit: Conspiracy to Tamper With A Witness and Conspiracy To Retaliate Against A Witness, as set forth in Counts One and Two of this Indictment, which are incorporated herein by reference, did knowingly possess and discharge a firearm in furtherance of said crimes of violence.

It also cited 18 U.S.C. § 2, which provides generally for aiding and abetting liability.

---

[2]Section 924(c) punishes "any person who, during and in relation to any crime of violence or drug trafficking crime . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm." 18 U.S.C. § 924(c)(1)(A). It includes a minimum sentence of five years, which increases to ten years "if the firearm is discharged." 18 U.S.C. §§ 924(c)(1)(A)(i), (iii).

In instructing the jury on Count Three, the district court omitted any reference to the indictment's "during and in relation to" language, telling the jury it could convict Ashley for "possessing a firearm in furtherance of" a crime of violence, which meant having "held a pistol and intentionally shot" Dixon "to carry out the objectives" of the crimes charged in the other counts of the indictment. It also instructed that if York violated Section 924(c), the jury could convict Ashley of that offense either under an aiding and abetting theory or under the doctrine of vicarious co-conspirator liability established in *Pinkerton v. United States*, 328 U.S. 640 (1946). The government essentially repeated these theories in its closing argument.

## A.

Ashley first argues that his indictment was constructively amended when, in describing Count Three to the jury, the district court and the government omitted the indictment's "during and in relation to" language. "When the government, through its presentation of evidence or its argument, or the district court, through its instructions to the jury, or both, broadens the bases for conviction beyond those charged in the indictment, a constructive amendment—sometimes referred to as a fatal variance—occurs." *United States v. Malloy*, 568 F.3d 166, 178 (4th Cir. 2009). To constitute a constructive amendment, the variance must in essence "change the elements of the offense charged, such that the defendant is actually convicted of a crime other than that charged in the indictment." *Id.* Any other variance "does not violate a defendant's constitutional rights unless it prejudices the defendant either by surprising him at trial and hindering the preparation of his defense, or by exposing him to the danger of a second prosecution for the same offense." *Id.*

As Ashley acknowledges, Section 924(c) has two separate prongs: a defendant can be convicted if he "uses or carries" a firearm "during and in relation to" a crime of violence or if

he "possesses" a firearm "in furtherance of" a crime of violence. Either one is sufficient to allow a conviction. 18 U.S.C. § 924(c)(1)(A). Since "during and in relation to" is not an element of the "possesses" version of the offense with which Ashley was charged, it was simply surplusage and could be omitted by the district court in its instructions. *See Malloy*, 568 F.3d at 178 (no constructive amendment where indictment's use of "knowingly" omitted from jury instructions since knowledge was not element of charged offense).

Ashley argues, however, that presence of the word "discharge" in the indictment indicates he was charged with violating the "uses-or-carries" version of the offense as well as the "possesses" version. It seems more likely, however, that the indictment was simply referring to the enhanced sentence provided under the statute in cases where a firearm is "discharged." 18 U.S.C. § 924(c)(1)(A)(iii). At any rate, Ashley's claim would fail even if he were correct that the indictment charged both versions of Section 924(c). "Where an indictment charges several offenses, or the commission of one offense in several ways, the withdrawal from the jury's consideration of one offense or one alleged method of committing it does not constitute a forbidden amendment of the indictment." *United States v. Miller*, 471 U.S. 130, 145 (1985).

Ashley's argument is evidently based on the idea that leaving out the "during and in relation to" language "broaden[ed]" the bases upon which the jury could convict him, *Malloy*, 568 F.3d at 178, because it meant that there was one less thing the government had to prove. But Ashley misconstrues what impermissible broadening of an indictment is about. Broadening means instructing the jury that it may find the defendant guilty on the basis of elements that were not set forth in the grand jury's indictment—a different version of the offense charged or a different offense altogether. *See Miller*, 471 U.S. at 145. "[A]ctual additions" to an indictment are forbidden, *id.* at 144, but here there was only a subtraction, and a jury can

be instructed on any "lesser included offense" whose elements were all contained within the grand jury's charge. *See United States v. Brooks*, 524 F.3d 549, 555 n.9 (4th Cir. 2008).

Nor can we perceive any problem of fair notice. The distinction between "during and in relation to" and "in furtherance of" is "a subtle one," to say the least. H.R. Rep. No. 105-344, at 11 (1997); *see also United States v. Avery*, 295 F.3d 1158, 1174 (10th Cir. 2002) (difference is "only slight"); *United States v. Mackey*, 265 F.3d 457, 461 (6th Cir. 2001) (difference "somewhat elusive"). But if anything, according to the drafters of the provision, "'in furtherance of' is a slightly higher standard, and encompasses the 'during and in relation to' language." H.R. Rep. No. 105-344, at 11; *see also United States v. Lomax*, 293 F.3d 701, 704-05 (4th Cir. 2002). So it would hardly have made any sense for Ashley to base his defense on defeating the "during and in relation to" portion of his indictment, and not surprisingly, there is no indication he attempted to do so. In short, the district court neither committed a fatal variance or prejudiced the defendant in its presentation to the petit jury of Count Three.

## B.

Ashley also objects to the jury's being told it could find Ashley guilty on Count Three not only if he aided and abetted York's violation of Section 924(c), but also by virtue of the doctrine of vicarious liability set forth in *Pinkerton v. United States*, 328 U.S. 640, 647 (1946). The *Pinkerton* doctrine makes a person liable for substantive offenses committed by a co-conspirator when their commission is reasonably foreseeable and in furtherance of the conspiracy. *See United States v. Singh*, 518 F.3d 236, 253 (4th Cir. 2008). Because we hold that an indictment need not set forth vicarious co-conspirator liability, it was not error for the district court to instruct the jury on this theory.

It is settled that vicarious liability predicated on having aided or abetted the crimes of another need not be charged in

an indictment. *See United States v. Wills*, 346 F.3d 476, 495 (4th Cir. 2003). The reason for this rule is that aiding and abetting simply describes the way in which a defendant's conduct resulted in the violation of a particular law. The federal criminal statute dealing with the subject speaks simply of agency and causation principles, providing that a person is punishable "as a principal" if he "aids, abets, counsels, commands, induces or procures" the commission of a federal offense or "willfully causes" another to do an act that would be criminal if he performed it himself. 18 U.S.C. § 2. Because the aiding and abetting provision does not set forth an essential element of the offense with which the defendant is charged or itself create a separate offense, aiding and abetting liability need not be charged in an indictment. *See United States v. Thirion*, 813 F.2d 146, 151 (8th Cir. 1987).

These same principles hold true in the case of vicarious co-conspirator liability. The *Pinkerton* doctrine is distinct from the substantive offense of conspiracy, which makes the very act of conspiring criminal. *See* 18 U.S.C. § 371. Instead, the *Pinkerton* doctrine is a means of apportioning criminal responsibility for the commission of substantive offenses. *Pinkerton*, 328 U.S. at 643-47. It provides that a person can commit an offense not only by engaging in the forbidden conduct himself but also by participating in a conspiracy that leads a confederate to engage in that conduct. As the *Pinkerton* Court explained, "so long as the partnership in crime continues, the partners act for each other in carrying it forward." *Id.* at 646. By joining the conspiracy, "[e]ach conspirator instigated the commission of the crime." *Id.* at 647. In other words, *Pinkerton* liability, like aiding and abetting liability, rests on notions of agency and causation. As the Court recognized, "[t]he rule which holds responsible one who counsels, procures, or commands another to commit a crime is founded on the same principle." *Id.* at 647.

Since the same reasons that make it unnecessary to charge aiding and abetting liability in an indictment underlie vicari-

ous co-conspirator liability, we hold that a district court does not constructively amend an indictment by giving a *Pinkerton* instruction when *Pinkerton* liability has not been charged by the grand jury. This has been the unanimous view of the circuit courts which have addressed this issue. *See United States v. Zackery*, 494 F.3d 644, 647-49 (8th Cir. 2007); *United States v. Budd*, 496 F.3d 517, 527-28 (6th Cir. 2007); *United States v. Creech*, 408 F.3d 264, 273 (5th Cir. 2005); *United States v. Lopez*, 271 F.3d 472, 480 (3d Cir. 2001); *United States v. Macey*, 8 F.3d 462, 468 (7th Cir. 1993); *United States v. Sanchez*, 917 F.2d 607, 612 (1st Cir. 1990); *United States v. Jackson*, 627 F.2d 1198, 1216-17 (D.C. Cir. 1980); *United States v. Carroll*, 510 F.2d 507, 509 (2d Cir. 1975); *United States v. Roselli*, 432 F.2d 879, 895 (9th Cir. 1970). Accordingly, the district court's instruction did not constructively amend Ashley's indictment.

Nor was this instruction in any way prejudicial. Ashley argues that, since conspiracy liability was explicitly set forth in the other counts of his indictment, the government was obliged to charge it in Count Three. This is backwards at best. The very fact that Counts One and Two charged Ashley with conspiracy offenses should have made it the more obvious that co-conspirator liability was a possibility, especially when the conspiracy charges served as the predicate offenses in Count Three and were incorporated by reference. Certainly there could be no danger of unfair surprise. *Malloy*, 568 F.3d at 179.

IV.

For the foregoing reasons, we reject each of Ashley's claims. The judgment is hereby

*AFFIRMED*.