RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0359p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            *v.*                                              No. 08-3439

THOMAS A. HENDERSON,
                        *Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 06-00039-001—Algenon L. Marbley, District Judge.

Argued: October 19, 2010

Decided and Filed: November 19, 2010

Before: MARTIN and McKEAGUE, Circuit Judges; LUDINGTON, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Kevin M. Schad, FEDERAL PUBLIC DEFENDER'S OFFICE, Cincinnati, Ohio, for Appellant. Benjamin C. Glassman, ASSISTANT UNITED STATES ATTORNEY, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Kevin M. Schad, FEDERAL PUBLIC DEFENDER'S OFFICE, Cincinnati, Ohio, for Appellant. Benjamin C. Glassman, ASSISTANT UNITED STATES ATTORNEY, Cincinnati, Ohio, for Appellee.

_____

## OPINION

_____

McKEAGUE, Circuit Judge. Defendant-appellant Thomas A. Henderson was convicted of bank robbery in 1981. Within three years after his release from prison, two

_____

[*] The Honorable Thomas L. Ludington, United States District Judge for the Eastern District of Michigan, sitting by designation.

persons who had assisted law enforcement authorities in the bank robbery prosecution were shot to death, in 1996 and 1998, respectively. Henderson was charged in 2006 with killing two witnesses in retaliation for providing information and testifying against him in the federal bank robbery prosecution, and with two unlawful-use-of-firearm offenses in relation to the killings. The jury returned a guilty verdict on all counts. Henderson was sentenced to two concurrent terms of life imprisonment on the murder counts and two consecutive two-year terms on the firearm counts. He asserts nine claims of error on appeal. Because none of the claims have merit, the district court's judgment is affirmed.

## I. BACKGROUND

In June 1981, defendant Thomas Henderson was traveling with Ecolia ("Coy") Washington from Columbus, Ohio, to Florida to visit a mutual friend in the Dade County Jail, Robert Earl Bass. After their car broke down in Macon, Georgia, they decided to rob a bank, the Macon Bank & Trust Company. Henderson actually conducted the hold-up, using a .38 caliber revolver and taking more than $160,000 from the bank. Washington drove the getaway vehicle. They drove to Atlanta, where Washington dropped Henderson off and returned to Columbus. Henderson got a ride back to Columbus with other friends. In July 1981, Bass, concerned about the way Henderson was treating his friend, Washington, called the FBI in Macon from jail and volunteered information regarding the bank robbery. This information led to Henderson's arrest. Washington had already been arrested. She agreed to testify against Henderson in exchange for immunity. In the ensuing federal trial, in the District of Georgia, Washington testified against Henderson. Henderson was convicted of bank robbery in October 1981 and sentenced to 25 years in prison.

Henderson was released from prison in April 1996 and returned to Columbus to live in the home of his ex-wife, Frances Henderson. In the early morning hours of November 4, 1996, Robert Bass was shot to death in his car outside his apartment in Pickerington, a suburb of Columbus. Authorities were unable to solve the crime. At about 5:30 a.m. on November 2, 1998, the body of Ecolia Washington was found in a

burning van near her home in a Columbus neighborhood. Washington had suffered multiple gunshot wounds, which had caused her death.

Not until 2006 did an FBI investigation yield enough evidence to secure an indictment against Henderson. In February 2006, Henderson was charged with two counts of retaliatory murder (for killing Robert Bass and Ecolia Washington in retaliation for their participation in the bank robbery prosecution), in violation of 18 U.S.C. § 1513(a)(1)(B) and § 1513(a)(1)(A), respectively; and two counts of using a firearm in relation to the killings, in violation of 18 U.S.C. § 924(c)(1)(A)(iii). Henderson pleaded not guilty and a jury trial commenced in June 2007. Following several days of trial and two days of deliberations, the jury returned its verdict: guilty on all four counts. Appellant Henderson asserts nine claims of error, addressed below in the order he has presented them.

## II.  ANALYSIS

### A.  Admission of Victims' Statements

During trial, the district court allowed the government to introduce evidence of statements previously made by the murder victims. First, through the testimony of retired FBI Agent Fred C. Stofer, who had participated in the 1981 Macon bank robbery investigation, the government was allowed to introduce exhibits bearing certain teletype communications. These teletype communications, between law enforcement offices in Macon, Miami and Columbus, relate to Robert Bass's willingness to provide information concerning the Macon bank robbery. Bass did not testify in the bank robbery trial, but Agent Stofer was allowed to read the contents of one of the teletype communications into the record:

> [O]n this date Robert Earl Bass incarcerated at Dade County Jail under
> the name Robert Earl, black male, date of birth, telephonically contacted
> the Macon RA regarding the above matter. Bass stated that he was – or
> that he has information regarding this case indicating specifically that he
> can provide information on the weapon used not yet recovered, the
> current location of the getaway car, a '73 Datsun not yet recovered,

registered to Bass, and that he can convince Ecolia Johnson to cooperate with Macon FBI office in this case.

R. 160-8, trial tr. vol. VII, p. 123; Gov't Appx. p. 6, ex. 1K.**[1]**

Second, the government was allowed to read into the record a sworn statement Ecolia Washington gave to police on August 27, 1981, before she testified against Henderson in the bank robbery trial:

> Ms. Wonsley, Question: How many times have you talked to him since you all have been here at the Law Enforcement Center?
>
> Answer: Twice on the telephone.
>
> Question: What has he said to you?
>
> Answer: Well, the first time he called me, well, you know, when Mr. Child's (sic) had told me about that you all would drop them two counts on me if I could come up with those three items, I tried to get Tommy to help me pay for my attorney some kind of way or to give me some more money, and that's why he called me, because he got my message that if he didn't give me no money, I was going to tell them.
>      "So he called me and he told me he had got my message and that he wouldn't advise me to do that. Knowing Tommy, you know, he told me he didn't believe that it was only my doing, it was me and Robert's doings and I just listened to him.
>
> Question, Mr. Tosi: Did he threaten you in any direct way; say he was going to burn down Woody's house or ribs up there or anything like that?
>
> Witness, answer: No. He just – he told me to think about it because he would do something to me if I was to do something to him. And that was it.

R. 160-12, trial tr. vol. XI, pp. 100-01.

Henderson contends these two statements are testimonial in nature and that their admission, without opportunity for cross-examination, was in violation of his right of confrontation. The district court admitted the statements under the "forfeiture by wrongdoing" exception to the hearsay rule, Fed. R. Evid. 804(b)(6), finding by a

---

**[1]** Ecolia Washington's name was formerly "Ecolia Johnson."

preponderance of the evidence that Henderson was "responsible" for Bass's and Washington's absence. R. 160-12, trial tr. vol. XI, pp. 2-7. Citing *Giles v. California*, 128 S.Ct. 2678 (2008), Henderson argues the forfeiture-by-wrongdoing doctrine does not provide an exception to the Sixth Amendment's right of confrontation.

Indeed, in *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004), the Supreme Court held that the Confrontation Clause requires that a defendant have an opportunity to confront the witnesses who give testimony against him, except in cases where an exception to that right was recognized at the time of the nation's founding. Unless such an exception applies, a testimonial statement made by an absent witness is admissible only if the defendant had a prior opportunity to cross-examine that witness. *Id.* at 68. In *Giles*, the Court observed that the doctrine of forfeiture by wrongdoing was, at common law, not intended to permit introduction of unconfronted hearsay statements unless there was clear proof that the defendant engaged in conduct *designed* to prevent the declarant's testimony by procuring his or her unavailability. *Giles*, 128 S.Ct. at 2683-84. Because the doctrine had not been invoked—either at the time of the nation's founding or in American jurisprudence prior to 1985—to obtain admission of murder victims' unconfronted statements absent a showing of such an intent to preemptively silence, the *Giles* Court refused to read the exception so broadly today.

Hence, because Bass and Washington could not have been killed, in 1996 and 1998, respectively, to prevent them from testifying against him in the bank robbery prosecution in 1981, and because there is no evidence that Bass and Washington were killed to prevent them from testifying against him in relation to any other offense, Henderson argues the forfeiture-by-wrongdoing doctrine has no application in this case. Indeed, there is no evidence that Henderson engaged in conduct designed to prevent Bass and Washington from testifying against him. In the wake of the *Giles* ruling, the district court's reliance on the forfeiture-by-wrongdoing doctrine is seen to have been misplaced. Yet, the government contends the error does not necessarily undermine the validity of Henderson's conviction because (a) Bass's statement was not testimonial, and (b) admission of Washington's statement was harmless error.

The court of appeals generally "reviews all evidentiary rulings—including constitutional challenges to evidentiary rulings—under the abuse-of-discretion standard." *United States v. Schreane*, 331 F.3d 548, 564 (6th Cir. 2003). Evidentiary rulings relating to violations of the Confrontation Clause, however, are reviewed *de novo*. *United States v. McGee*, 529 F.3d 691, 697 (6th Cir. 2008). Further, violations of the Confrontation Clause are subject to harmless error analysis. *Id.* Errors are deemed harmless when "the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Id.* (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986)). If the court finds that the error is harmless, an otherwise valid conviction should not be set aside. *Id.*

### 1. *Bass's Statement*

Even though the district court may have improperly relied on the forfeiture-by-wrongdoing exception to admit Bass's statement, and even though Henderson never had a chance to cross-examine Bass, the government contends that admission of the statement does not run afoul of the Sixth Amendment because Bass's statement is not testimonial hearsay. Indeed, Bass's offer to provide information to the FBI was introduced not to show that he provided truthful information regarding the location of the weapon and vehicle used in the bank robbery, but to show that he made the offer to assist authorities. Whether or not Bass actually possessed and provided the information he claimed to have was irrelevant to the inquiry whether Henderson retaliated against Bass for giving information to the authorities. However, the fact that Bass made such an offer to the FBI tends to show that Bass cooperated with the government in the bank robbery prosecution, thus bringing his murder within the purview of retaliation under 18 U.S.C. § 1513(a)(1)(B). Consequently, Bass's offer to provide information to the FBI was admissible over Henderson's Confrontation Clause objection because it was not testimonial hearsay offered to establish the truth of the matter asserted, but was introduced only to establish the verbal act. *See Crawford*, 541 U.S. at 59 n.9 ("The [Confrontation] Clause does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."); *United States v. Childs*, 539 F.3d

552, 559 (6th Cir. 2008) (finding statement admissible non-hearsay as it was relevant to show that the declaration was made, not the truth of the declaration); *United States v. Goosby*, 523 F.3d 632, 638 (6th Cir. 2008) (finding no Confrontation Clause violation where declarant did not make statements that would be characterized as testimonial hearsay).

Furthermore, the fact that the district court incorrectly relied on the forfeiture-by-wrongdoing doctrine in admitting Bass's statement, as opposed to the non-hearsay rationale, is of no consequence. "A decision below must be affirmed if correct for any reason, including a reason not considered by the lower court." *Childs*, 539 F.3d at 559 (quoting *Russ' Kwik Car Wash, Inc. v. Marathon Petroleum Co.*, 772 F.2d 214, 216 (6th Cir. 1985)). It follows that the district court's decision to admit Bass's statement into evidence was not reversible error.

### 2. *Washington's Statement*

The government acknowledges that, to the extent Washington's proffer included her account of what Henderson said to her, it should not have been admitted because it included testimonial hearsay offered to show Henderson's retaliatory animus. However, the government maintains the error was harmless, because Washington's statement that Henderson said "he would do something to me if I was to do something to him" was not central to the government's case and was cumulative of other more direct evidence of Henderson's retaliatory motivation.

As indicated above, violations of the Confrontation Clause are subject to harmless error analysis. *McGee*, 529 F.3d at 697. In this context, an error may be deemed harmless if the record contains substantial evidence apart from the improperly admitted evidence so that there is no reasonable probability that the admission made a difference to the jury's verdict. *See Doan v. Carter*, 548 F.3d 449, 459 (6th Cir. 2008); *United States v. Driver*, 535 F.3d 424, 428 (6th Cir. 2008); *McGee*, 529 F.3d at 698-99.

Here, to be sure, there was sufficient evidence apart from Washington's statement establishing retaliatory animus and supporting the jury's verdict. Specifically,

the government points to a letter from Henderson to Washington while they were in jail awaiting trial in the bank robbery case. The letter was admitted into evidence without objection. It warned Washington not to cooperate with the police or "you'll also be shortening your own life considerably." Gov't App'x p. 4, ex. 1H. This letter represents even stronger evidence of Henderson's retaliatory animus. Its admission into evidence rendered Washington's inadmissible proffer statement cumulative.

In addition, multiple witnesses testified that Henderson admitted committing the murder. Ronald Beauford is a step-brother of one of Henderson's sons. He looked up to Henderson as a father figure. He testified in trial that on the day Washington was killed, Henderson told him to watch the eleven o'clock news. Seeing the report of Washington's death, he asked Henderson if that's what Henderson wanted him to see. Henderson responded, "Yeah, that's how I handle business." R. 160-10, trial tr. vol. IX, p. 34. The next day Henderson explained to Beauford that he had to stalk Washington to make sure he caught her at the right time; that she had "told on him" for robbing a bank; that snitches deserved to die. *Id.* at 37-39.

An inmate known as General Smith, with whom Henderson was jailed in 2001, testified that Henderson "[t]alked about how his codefendants actually told on him on his bank robbery and he had killed them." R. 160-10, trial tr. vol. IX, p. 111. A second inmate, Michael Williams, testified about a similar admission made by Henderson years later. Henderson explained to Williams that "real killers carry revolvers . . . because the shells go with you." *Id.* at 177. Later, FBI Special Agent Tim Creedon testified that Henderson had purchased a .38 caliber revolver, a Smith & Wesson Model 10, in 1998 under an assumed name. Mark Hardy, a criminalist, had testified that the bullets recovered from Washington's body were .38 caliber and could have been fired by a Smith & Wesson Model 10.

It thus appears that Washington's improperly admitted proffer statement was not central to the prosecution; it was merely cumulative of other evidence establishing Henderson's retaliatory motive for killing Washington. Considering the substantial evidence establishing that Henderson  murdered Washington because she cooperated

with the prosecution in the bank robbery case, we hold "the constitutional error was harmless beyond a reasonable doubt." *McGee*, 529 F.3d at 697 (quoting *Van Arsdall*, 475 U.S. at 681).

In sum, because Bass's statement was not introduced for the truth of the matter asserted  and was not, therefore, testimonial hearsay; and because the admission of Washington's statement constituted harmless error, the district court's reliance on the forfeiture-by-wrongdoing doctrine to admit both statements, though erroneous, does not warrant appellate relief.

### B.  Ineffective Assistance of Counsel

Henderson contends his trial counsel, Diane Menashe and David Stebbins, were ineffective in two respects.  First, he contends the cross-examination of Agent Tim Creedon was mishandled in such a way as to open the door to damaging testimony by Christie Collins, a witness whose credibility the government conceded was suspect and who would not otherwise have testified.  Second, counsel are said to have been ineffective for failing to object to the admission of tape-recorded telephone conversations between Henderson, while incarcerated, and others.

To demonstrate that counsel's performance was constitutionally deficient, Henderson must show that it "fell below an objective standard of reasonableness" and that it prejudiced the defense. *Strickland v. Washington*, 466 U.S. 688, 687-88 (1984). The reviewing court's  scrutiny of counsel's performance is "highly deferential;" the defendant must overcome the presumption that the challenged action might be considered sound strategy. *Id.* at 689.  To show prejudice, Henderson must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Ineffective assistance claims are ordinarily deferred until post-conviction proceedings under 28 U.S.C. § 2255, when an evidentiary hearing can be held to ascertain whether counsel's conduct was motivated by sound strategy. *United States v.*

*Watkins*, 509 F.3d 277, 283 (6th Cir. 2007). However, if the record is adequately developed, an ineffective assistance claim may be considered on direct review. *Id.*

**1. *Collins' Testimony***

Christie Collins was living with Robert Bass on the night he was killed. Hearing gunshots, she had ventured out of their apartment to find Bass dead in his car. Prior to trial, the government had advised the court and defense counsel that it did not intend to call Collins because of uncertainty about her credibility. However, Assistant U.S. Attorney David Devillers changed his mind after defense counsel's cross-examination of Agent Creedon created the impression that money had been taken from Bass after he was killed, suggesting the motive for the murder may have been robbery rather than retaliation. Devillers was obliged to call Collins to explain that she had taken the money out of the apartment in a suitcase. She also testified, however, that she had seen the killer at Bass's car that night, and she eventually came to identify Henderson as the perpetrator.

Henderson argues that Collins is the only eye-witness of either homicide and that, but for counsel's deficient cross-examination of Agent Creedon, Collins would never have been called. Review of Collins' testimony reveals that she was indeed a colorful witness; a confessed drug trafficker who spent some fourteen of the previous twenty-one years in prison. Her testimony was erratic and of questionable reliability. She initially identified a different suspect as the killer, and changed her mind only after seeing Henderson at a drug house some time later. She was cross-examined at some length by defense counsel—to marginal effect.

Yet, without a more fully developed record, we are in no position to fairly evaluate Henderson's threefold assertion that defense counsel's cross-examination of Agent Creedon was so inept as to be objectively unreasonable, that Collins would not otherwise have been called, and that there is a reasonable probability that her testimony affected the jury's verdict. At this stage, based on the present record, we could only conclude that Henderson has failed to carry his burden of showing ineffective assistance of counsel. Instead of denying the claim on the merits, however, we deny it as

premature, without prejudice to his right to seek collateral relief under § 2255 based on a more fully developed record.

### 2. *Prison Telephone Recordings*

During trial, the government was allowed to play recordings of telephone conversations between Henderson, while imprisoned, and others. Henderson contends the jury was permitted to hear not only conversations regarding attempts by him and his family to influence witnesses in the case, but also de facto testimony by him on his feelings about the victims' deaths. Henderson now contends counsel's failure to object to such hearsay evidence constituted ineffective assistance.

We disagree. Counsel's failure to object was not deficient because any hearsay objection would have been overruled. The statements made by Henderson during the conversations were non-hearsay admissions under Federal Rule of Evidence 801(d)(2)(A), and the statements made by others were not admitted to show the truth of the matters asserted, but to provide context for Henderson's admissions. *See United States v. Jacob*, 377 F.3d 573, 581 (6th Cir. 2004); *United States v. Davis*, 170 F.3d 617, 627 (6th Cir. 1999). Inasmuch as no additional factual development would alter the conclusion that this ineffective assistance of counsel claim is meritless, we conclude that it is ripe for disposition and hereby deny it on its merits.

### C. Allowance of Collins' Testimony

Henderson contends the district court, having been advised pre-trial of the government's unwillingness to vouch for Christie Collins' credibility, and having denied the government's request to call her as a witness under Federal Rule of Evidence 614, should have exercised its discretion *sua sponte* to exclude her testimony. To allow the testimony of an "incompetent" witness is said to have been an abuse of discretion. Alternatively, Henderson complains that the government's decision to call Collins despite misgivings about her credibility constituted subornation of perjury and denied him due process.

Despite his protestations, Henderson has not even so much as *identified* any part of Collins' testimony that substantiates the charge that she was not competent to testify or testified falsely.  Yes, the Assistant U.S. Attorney was forthrightly reticent to call Collins, but when he felt constrained to do so, Henderson did not object.  The issue is raised for the first time in this appeal.  Hence, the claim that the court abused its discretion or that the government engaged in prosecutorial misconduct is subject only to plain error review.  *See* Fed. R. Crim. P. 52(b).  In other words, to win relief on appeal, Henderson must establish that "(1) an error occurred; (2) the error was obvious or clear; (3) the error affected his substantial rights; and (4) the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Mayberry*, 540 F.3d 506, 512 (6th Cir. 2008) (quoting *United States v. Cline*, 362 F.3d 343, 348 (6th Cir. 2004)).  Henderson is hard-pressed to meet any of these four requirements without identifying how Collins manifested incompetence or testified falsely.

Granted, Collins' testimony was erratic and of questionable reliability, but this characterization could be used to describe the testimony of a sizable portion of witnesses who commonly testify in criminal cases.  Significantly, the transcript offers no grounds to question Collins' rationality while testifying, or whether she was under the influence of any drug or medication, or whether she understood her obligation to tell the truth.  Nor is Collins' testimony manifestly false in any way.  She appears to have been a cooperative witness.  It was for the jury to assess her credibility and determine the weight her testimony was entitled to.

In sum, Henderson has not carried his burden of demonstrating that the district court committed plain error or that the prosecution engaged in any misconduct that affected his substantial rights and the fairness of the trial.

## D. Rule 404(b) "Other Bad Acts" Evidence

Next, Henderson complains that the trial court erroneously allowed the government to introduce evidence of other bad acts he had committed under Federal Rule of Evidence 404(b) without identifying the admissible purpose and without giving contemporaneous limiting instructions to minimize any unfair prejudicial effect.[2] Henderson identifies three objectionable items of evidence. The government contends there was no error because each item of evidence related not to *other* bad acts, but to the crimes charged. Again, because no objection was made at trial, plain error review applies.

### 1. *Beauford's Testimony*

Henderson points first to the testimony of Ronald Beauford. The day after Washington was murdered—that is, the day after Beauford had seen the eleven o'clock news report of the discovery of Washington's body and had heard Henderson explain, "that's how I handle business"—Henderson called Beauford and three others together at the All-in-One Store run by Henderson. Henderson ensured that Beauford and at least one of the others were armed with guns. He told them that Washington's nephew or cousin, Jimmy Freeman, thought Henderson had killed Washington and was coming to the store for a meeting. Henderson told them, "if anything happens, don't let him [Freeman] get out alive." R. 160-10, trial tr. vol. IX, p. 35. After Freeman came and went, without incident, Henderson explained to Beauford that he had to stalk Washington and that she got "what she deserved . . . because the bitch was a rat." *Id.* at 36-38. Henderson later told Beauford that Washington "had told on him and that's why he was in jail . . . for robbing a bank or something." *Id.* at 38.

---

[2]Rule 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Beauford's testimony was legitimately offered for an admissible purpose: because it tended to prove that Henderson was the killer and what his motive was. The Freeman encounter was among the events during which Henderson admitted to Beauford that he killed Washington and why. Where the challenged evidence is "intrinsic" to, or "inextricably intertwined" with evidence of, the crime charged, Rule 404(b) is not applicable. *See United States v. Gonzales*, 501 F.3d 630, 638-39 (6th Cir. 2007); *United States v. Everett*, 278 F.3d 986, 992 (6th Cir. 2001). In this argument, however, Henderson attempts to tease-out and focus on one aspect of the Freeman encounter: the evidence that he, a convicted felon, possessed guns and instructed others to assault and even kill Freeman, i.e., other bad acts, the revelation of which may have unfairly prejudiced him in the eyes of the jury.

Clearly, if a contemporaneous objection had been made, a limiting instruction could have been requested and given, advising the jury that Henderson had not been charged with any offenses growing out of the Freeman encounter and that they should consider the evidence only for its tendency to prove the elements of the charges stemming from Washington's death. But no objection was made, and the court can hardly be deemed to have had a *sua sponte* duty to specially call the jury's attention to these "other bad acts." Moreover, the notion that Henderson was so unfairly prejudiced by this evidence as to adversely affect his substantial rights and impugn the fairness and integrity of the trial is preposterous. The notion that the jury was distracted by or placed *any* significance on the marginal details of the Freeman encounter, instead of focusing on the intended and legitimate significance of Beauford's story—i.e., Henderson's admission of retaliatory murder—is simply implausible. There was no plain error in the admission of Beauford's testimony.

### 2. *Humphrey's Testimony*

Stanley Humphrey was one of the friends who brought Henderson back to Columbus from Atlanta after the 1981 Macon bank robbery. Humphrey testified for the prosecution at trial. He testified that when they returned to Columbus, Henderson offered him Coy Washington's "cut from the robbery . . . but I needed to make her

disappear." R. 160-9, trial tr. vol VIII, p. 177. Humphrey explained, "[Henderson] wanted me to kill Coy and get rid of the body . . . because he knew the FBI was going to be questioning her." *Id.* at 177-79. Humphrey was unsure about carrying out Henderson's plan, but his involvement became a moot question when Humphrey was arrested shortly thereafter and eventually imprisoned for a different murder. Henderson now contends this evidence should not have been admitted.

Again, evidence of Henderson's desire to have Washington killed was relevant to prove his retaliatory motive. Humphrey's testimony about Henderson's offer to pay him for killing her was intrinsic to the crime charged and was not, therefore, Rule 404(b) evidence. *See Gonzales*, 501 F.3d at 638-39; *Everett*, 278 F.3d at 992. The district court did not plainly err in admitting Humphrey's testimony.

### 3. *McClendon's Testimony*

Ace McClendon was a heroin addict who helped lure Bobby Bass out of his house in November 1996 (by pretending to want to buy drugs from him) so that Henderson could kill him. McClendon testified that a couple days after the murder plot had been successfully completed, Henderson brought him some drugs that he did not have to pay for. Henderson did not object at trial, but now contends this was Rule 404(b) evidence that was not admitted for an admissible purpose and was not accompanied by a limiting instruction. Henderson contends this evidence of his involvement in drug trafficking may have unfairly prejudiced him in the eyes of the jury. Clearly, this evidence was intrinsic to the story of Bass's murder, tending to show that it was Henderson, with McClendon's assistance, who carried out the actual killing. The evidence was not Rule 404(b) evidence and its admission was not improper.

### E.  Failure to Substitute Counsel

Henderson contends the trial court erred by failing to order substitution of new defense counsel after learning of reason to believe there had been a breakdown in the attorney-client relationship between Diane Menashe and himself. He contends he was denied his Sixth Amendment right to conflict-free counsel.

The claim grows out of an incident that occurred during jury selection *voir dire*. Henderson took exception to the way in which Menashe was asking certain *voir dire* questions. He asked her to rephrase her questions. Then, as he "was wearing a restraining device that would, in the event of a problem, shock him, [he] joked with counsel that if she did not desist, he would hug her so that when the officer activated the restraining device, it would shock her as well." Appellant's brief p. 28. Henderson contends Menashe did not see the humor in this, "took it as a threat, and refused to communicate with the Appellant." *Id.* When the court learned there was a problem, it made inquiry in a separate proceeding (outside the presence of the government), but Henderson now contends the inquiry was inadequate. He argues the court failed to ensure that counsel could continue to effectively represent him.

The transcript of the separate proceeding conclusively defeats Henderson's challenge to the adequacy of the district court's inquiry. When the court asked Menashe about the extent to which the misunderstanding would interfere with her ability to zealously represent Henderson, she responded unequivocally, "None whatsoever, Your Honor." Separate record tr. p. 5. For his part, Henderson expressed his satisfaction with Menashe's representation, saying she "has been doing an outstanding job to this point." *Id.* at 16. Reassured that both attorney and client understood their roles in the relationship, the court told them the issue would be revisited if communication became a problem during the trial. *Id.* at 14. Neither Henderson nor Menashe requested substitution of counsel and it appears no further question regarding the integrity of the attorney-client relationship arose during the remainder of the trial.

In *United States v. Vasquez*, 560 F.3d 461 (6th Cir. 2009), the court observed that a defendant who wants substitution of appointed counsel *must* "bring any serious dissatisfaction with counsel to the attention of the district court." *Id.* at 466 (quoting *Benitez v. United States*, 521 F.3d 625, 632 (6th Cir. 2008)). "Once a defendant expresses his dissatisfaction with counsel, the district court is obliged to conduct an inquiry into the defendant's complaint to determine whether there is good cause for substitution of counsel." *Id.* The court considers the following factors:

When reviewing a district court's denial of a motion to withdraw or substitute counsel, we generally must consider: (1) the timeliness of the motion, (2) the adequacy of the court's inquiry into the matter, (3) the extent of the conflict between the attorney and client and whether it was so great that it resulted in a total lack of communication preventing an adequate defense, and (4) the balancing of these factors with the public's interest in the prompt and efficient administration of justice.

*Id.* (quoting *United States v. Mack*, 258 F.3d 548, 556 (6th Cir. 2001).

Review of the separate hearing record clearly demonstrates that the district court did not abuse its discretion in its handling of the misunderstanding between Henderson and his counsel. Considering that Henderson never requested substitution of counsel, did not assert that there was a breakdown in the attorney-client relationship, and expressed *satisfaction*, not dissatisfaction, with counsel's performance, the district court's handling of the matter was entirely appropriate.

**F. Sufficiency of the Evidence**

Henderson contends the government failed to carry its burden of proving that he killed either Bass or Washington or that he did so in retaliation for their participation in the bank robbery prosecution. Henderson cites, in particular, the lack of physical evidence and eye-witness testimony linking him to either murder, and the lack of competent evidence that he knew Bass cooperated with the FBI in the bank robbery prosecution.

To prevail on this argument, Henderson must bear a heavy burden. *United States v. Graham*, — F.3d — , 2010 WL 3632149, at *2 (6th Cir. Sept. 21, 2010). In reviewing the insufficiency of the evidence challenge, the court "examine[s] the evidence in the light most favorable to the government and draw[s] all inferences in the government's favor in order to determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt." *United States v. Torres-Ramos*, 536 F.3d 542, 556 (6th Cir. 2008). "This analysis does not require the removal of every hypothesis except that of guilt." *Id.*

Henderson's argument about the dearth of physical evidence and eye-witness testimony is not unfounded. But physical evidence is not required to sustain a conviction. *Graham*, 2010 WL 3632149, at *2. Further, the fact that the testimony of various accomplices is not corroborated by eye-witness testimony is of little consequence. "[I]t is well-settled that uncorroborated testimony of an accomplice may support a conviction in federal court." *Id.* (quoting *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999)). To conclude that no rational trier of fact, viewing this record in the light most favorable to the government, could find Henderson guilty of the charged offenses, the court would have to ignore abundant testimony from Henderson's friends, relatives and acquaintances (including Beauford, Williams, Smith, McClendon, and Humphrey, discussed above) about statements from his own mouth either admitting or pointing strongly toward guilt. Presumably, Henderson would have the court dismiss this testimony as lacking in credibility. But for the court of appeals to assess witness credibility would be to impermissibly "invade the province of the jury as the sole finder of fact in a jury trial." *Id.* (quoting *United States v. Bearden*, 274 F.3d 1031, 1039 (6th Cir. 2001)). Henderson's implicit attack on witness credibility is simply a challenge to "the quality of the government's evidence and not the sufficiency of the evidence." *Id.* (quoting *United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006)).

Henderson correctly points out that there was no direct evidence that he actually knew that Bass cooperated with the FBI in the bank robbery prosecution. Absent evidence of actual knowledge of cooperation, he asks, how can he be found guilty of retaliating for the cooperation? Yet, "[i]n a case of witness retaliation, the government need not adduce direct evidence of Appellant's knowledge of a witness's informant status in order for the jury to infer his intent to retaliate." *United States v. Ashley*, 606 F.3d 135, 140 (4th Cir. 2010) (quoting *United States v. Brown*, 937 F.2d 32, 36 (2d Cir. 1991)). This is so because the government is not required to produce a "smoking gun" that reveals the contents of defendant's mind. *Id.* at 140-41. "Though a jury may not convict based on rank speculation, it is entitled to deduce and infer." *Id.* at 140. Here, the testimony of McClendon, Beauford, Smith and Williams concerning statements made by Henderson relating to his desire to kill the "snitches" who "told on him" for the bank

robbery was sufficient to justify the reasonable inference that Henderson killed Bass in retaliation for cooperating—even *if* the cooperation was only suspected and not actually known by Henderson.  In sum, the sufficiency of the evidence challenge is meritless. The jury's verdict is not irrational and must be upheld.

### G.  Jury Instructions

Henderson contends the district court erred when it refused to give a requested jury instruction.  He had requested an instruction requiring the jury to explicitly find that he knew of Bass's cooperation with the FBI in the bank robbery prosecution in order to find him guilty of retaliatory murder under 18 U.S.C. § 1513(a)(1)(B).  The court reviews a district court's decision not to give a requested instruction for abuse of discretion.  *United States v. Triana*, 468 F.3d 308, 315 (6th Cir. 2006).  An abuse of discretion may be found if "(1) the proposed instruction is substantially correct; (2) the proposed instruction is not substantially covered by other delivered charges; and (3) the failure to give the instruction impaired the defendant's theory of the case."  *Id.*

The district court concluded that the substance of Henderson's proposed instruction was substantially covered by the instructions given.  The instructions given by the court required proof that Henderson intentionally killed Bass in retaliation for providing information to the FBI. The court thus concluded that the purpose for the "knowledge" instruction urged by Henderson was already satisfied by the finding-of-intent-to-retaliate requirement.  As the court stated:

> I think that there would be some redundancy.  If he intended to kill someone because they retaliated, that sort of presumes that he knew or at least believed that that person had provided some information; otherwise, it would not be a retaliation.
>
> So, once there is the intent, I think that that subsumes the knowingly elemental issue.

R. 160, trial tr. vol. XII at 19.

The district court's identification of a potential redundancy finds support in the fact that the code language does not contain an explicit knowledge-of-cooperation

element.  *See* 18 U.S.C. § 1513(a)(1)(B) ("Whoever kills or attempts to kill another person with intent to retaliate against any person for providing to a law enforcement officer any information relating to the commission or possible commission of a Federal offense . . . shall be punished as provided in paragraph (2)."). Consistent with this language, the elements of the offense have been defined without inclusion of such an explicit knowledge-of-cooperation requirement:

> The elements of an offense under18 U.S.C. § 1513 are (1) knowing engagement in conduct (2) either causing, or threatening to cause, bodily injury to another person (3) with the intent to retaliate for, *inter alia,* the attendance or testimony of a witness at an official proceeding.

*United States v. Cofield*, 11 F.3d 413, 419 (4th Cir. 1993); *see also United States v. Wardell*, 591 F.3d 1279, 1291 (10th Cir. 2009) (same). The district court's ruling also finds support in the case law discussed above, addressing this question in the context of a sufficiency-of-the-evidence challenge. *See, e.g.*, *Ashley*, 606 F.3d at 140 ("[I]n a case of witness retaliation, the government need not adduce direct evidence of appellant's knowledge of a witness's informant status in order for the jury to infer his intent to retaliate.")

Moreover, Henderson's theory of the case was not impaired by the district court's refusal to include the requested instruction. The denial of the instruction did not foreclose Henderson from arguing that retaliation had not been proved. Henderson did in fact make such an argument. Because Henderson's proposed instruction was substantially covered by the instructions given, and its denial did not impair Henderson's theory of the case, the district court did not abuse its discretion by refusing to give the requested instruction.

### H.  Defendant's Presence at Critical Stage

A half-hour after the jury had been excused from the courtroom to begin their deliberations at 2:04 p.m. on Friday June 22, 2007, the jury indicated that they wished to adjourn for the day and begin deliberations the following Monday. The district judge addressed this request with counsel on the record in the courtroom in the absence of

defendant Henderson, who was held in the custody of the Marshals. Both defense counsel and the Assistant U.S. Attorney preferred to have the jury begin deliberations right away. The judge elected to bring the jury back into the courtroom to deliver this answer and inquired as to whether defense counsel would waive defendant's right to be present. Counsel so waived. Then, in the absence of the defendant, the court, without incident, instructed the jury to commence deliberating. The jury continued deliberating until 5:35 p.m., when they decided to adjourn for the day. The court dismissed them with instructions to return and continue deliberating on Monday at 9:00 a.m.

Although Henderson stated no objection at the time, he now contends that he had a right to be present for the court's communication with the jury and that his attorney's waiver of this right was ineffective because not made knowingly and intelligently. He contends this denial of his right to be present during a critical stage of the trial violated his Sixth Amendment rights. Henderson acknowledges that his claim is subject to plain error review. Thus, he must show not only that the trial court committed plain error by not insisting, over his attorney's waiver, that Henderson be brought into the courtroom so that the court could again instruct the jury to begin deliberating, but also that such error adversely affected his substantial rights and the fairness, integrity and public reputation of the trial. *Mayberry*, 540 F.3d at 512. Henderson has not even tried to meet the latter two requirements. He has not even argued that any prejudice resulted from his absence. Instead, he contends the error is reversible *per se*, citing *United States v. Barnwell*, 477 F.3d 844, 852 (6th Cir. 2007).

*Barnwell* is clearly distinguishable. In *Barnwell*, the court was faced with repeated *ex parte* communications between the court and the prosecuting attorney and the jury foreperson—i.e., without the presence of the defendant *or* his counsel or even their knowledge that the meetings were taking place. The court held these errors "prejudiced the effectiveness of Barnwell's legal representation and violated his right to due process of law." *Id.* Here, in contrast, defense counsel was present for all communications with the jury and expressly waived Henderson's right to be present

during what was a purely technical procedure that had no bearing on Henderson's substantive rights.

We have recognized that a defendant's right to be present at every stage of the trial is not absolute, but exists only when "his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." *United States v. Brika*, 416 F.3d 514, 526 (6th Cir. 2005) (quoting *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987)). In other words, the defendant's presence is not guaranteed when it would be "useless," but only "to the extent that a fair and just hearing would be thwarted by his absence." *Id.* In *Brika*, the court held that where "the judge did nothing more than give the jurors a technical and perfunctory rereading or explanation of previously-given instructions, we fail to see how [defendant's] absence . . . thwarted a fair trial." *Id.* at 527. The same reasoning applies here. Henderson has failed to show any error, much less remediable plain error.

### I. Prison Telephone Recordings

In his second claim of error (part II.B.2, above), Henderson contends that defense counsel rendered ineffective assistance by failing to object the government's introduction of audio-recordings of certain prison telephone conversations between himself and others. Here, in his ninth and final claim of error, he contends the trial court abused its discretion by not excluding the recordings despite his counsel's failure to object. In other words, he contends the admission of the recordings was such an egregious error as to demand *sua sponte* action by the court. As explained above, however, Henderson has failed to show that the admission of the recordings was error at all. They did not constitute inadmissible hearsay. It follows that the district court committed no error, much less plain error, by admitting them.

But Henderson insists that *if* the recordings did not contain inadmissible hearsay, then his request to permit introduction of additional tape recordings pursuant to the doctrine of completeness was erroneously denied. Again, the law does not support Henderson's argument.

First, "the 'rule of completeness' allows a party to correct a misleading impression created by the introduction of part of a writing or conversation by introducing additional parts of it necessary to put the admitted portions in proper context." *United States v. Holden*, 557 F.3d 698, 705 (6th Cir. 2009). Henderson has failed to identify any misleading impression created by the recordings that were introduced. Second, although the government was properly permitted to introduce select recordings because Henderson's parts in the conversations were admissible as admissions of a party-opponent under Rule 801(d)(2), Henderson could not take advantage of this hearsay exclusion to introduce his own out-of-court statements. *See Holden*, 557 F.3d at 706. The district court did not, therefore, abuse its discretion by refusing to allow Henderson to introduce additional recordings.

## III.  CONCLUSION

Accordingly, defendant Henderson having failed to identify any remediable error by the district court or any instance of ineffective assistance in defense counsel's representation of him,  the judgment of the district court is **AFFIRMED.**