**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

No. 10-5217

LARRY WHITFIELD,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Robert J. Conrad, Jr., Chief District Judge.
(3:09-cr-00009-RJC-1)

Argued: May 18, 2012

Decided: August 22, 2012

Before WILKINSON, NIEMEYER, and KING,
Circuit Judges.

Affirmed in part, vacated in part, and remanded by published
opinion. Judge King wrote the opinion, in which Judge
Wilkinson and Judge Niemeyer joined.

## COUNSEL

**ARGUED:** Thomas Norman Cochran, FEDERAL DEFEND-ERS OF WESTERN NORTH CAROLINA, INC., Asheville, North Carolina, for Appellant. Amy Elizabeth Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee. **ON BRIEF:** Angela G. Parrott, Acting Executive Director, Matthew R. Segal, Allison Wexler, FEDERAL DEFENDERS OF WESTERN NORTH CARO-LINA, INC., Asheville, North Carolina; Kevin A. Tate, Erin K. Taylor, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant. Anne M. Tompkins, United States Attorney, Charlotte, North Carolina, for Appellee.

## OPINION

KING, Circuit Judge:

Larry Whitfield appeals his convictions and aggregate life-plus-sixty-month sentence in the Western District of North Carolina for his role in a botched bank robbery and a mid-escape home intrusion, which ended tragically in the death of an innocent elderly woman. Whitfield asserts four appellate contentions, only one of which has merit — that the district court erred in instructing the jury on an offense not charged in the indictment. As explained below, we are constrained to vacate Whitfield's conviction and mandatory life sentence on the uncharged offense and remand for an amendment of the judgment and resentencing, while affirming the balance of his convictions.

## I.

### A.

On the morning of September 26, 2008, Whitfield and his partner-in-crime Quanterrious McCoy — armed with a .357 handgun and an AK-47 assault rifle — entered the front door of the Fort Financial Credit Union in Gastonia, North Carolina.[1] As they crossed the threshold into the credit union's small vestibule, a metal detector triggered an automatic locking mechanism on the inside lobby doors. Whitfield shook the bulletproof doors, but the lock held fast, preventing entry into the lobby of the credit union. As a result, Whitfield and McCoy fled in their car in an eastwardly direction towards Charlotte on Interstate 85. Alerted to the attempted bank robbery, a Gastonia police officer began pursuing a white Ford Crown Victoria with two occupants matching the culprits' descriptions. Because it was raining and the Gastonia officer was fearful of an accident, he withdrew from the high-speed pursuit. The officer was about to exit the interstate when he noticed that the Crown Victoria had left the highway and was stuck in the median. Whitfield and McCoy had fled the vehicle on foot into the woods, ditched their firearms, made their way to nearby Belmont, North Carolina, and separated from one another.

McCoy was apprehended after being found hiding under a van. Whitfield opted to forcibly enter the residence of a woman named Tina Walden, who soon thereafter returned from work. When Walden sought to unlock her door and enter her home, she realized the lock was jammed and noticed a footprint on the door. While Walden was attempting to call her husband by cell phone, Whitfield opened the door from inside the residence, brandished a kitchen knife, and

---

[1]We recite the relevant facts in the light most favorable to the government, as the prevailing party at trial. *See United States v. Jefferson*, 674 F.3d 332, 341 n.14 (4th Cir. 2012).

instructed Walden to "shut up and come in." J.A. 532.[2] Instead, Walden turned and ran. Whitfield then fled from Walden's home, discarding the knife along his escape route to the nearby home of Herman and Mary Parnell. He entered the Parnell residence through the unlocked front door and encountered Mrs. Parnell, who was home alone. Mrs. Parnell immediately became very upset and began to cry. Meanwhile, Whitfield used his cell phone to text message a friend, Tamecia Sanders, notifying her that he was in trouble and asking for a ride. Sanders spoke on the phone with Whitfield several times during the approximate twenty-mile drive from her location on the east side of Charlotte to the Parnell residence. During their final conversation, Sanders informed Whitfield that she needed directions in order to find him. At that time, Sanders overheard Whitfield tell Mrs. Parnell, "[M]a'am, just calm down. I'm probably more scared than you are, and I'm actually just trying to leave." *See id.* at 673. Sanders also spoke on the phone directly with Mrs. Parnell. According to Sanders, Mrs. Parnell sounded afraid, though she calmed herself enough to give Sanders directions.

When Whitfield got back on the phone with Sanders, he said that "it looked like [Mrs. Parnell] wasn't breathing." J.A. 680. Sanders also overheard Mrs. Parnell say that she was short of breath, to which Whitfield inquired whether she had "any aspirin or anything that she usually takes [and] if he could get her a glass of water." *Id.* at 753. Sanders suggested that Whitfield "step outside in the hallway," "give [Mrs. Parnell] a minute," and call an ambulance. *Id.* at 680. Whitfield did not call the ambulance, but remained on the phone with Sanders, remarking to her sporadically that Mrs. Parnell appeared to be unconscious and may have died. Between 3:30 and 4:00 p.m., a neighbor of the Parnells, Joshua Smith, an off-duty police officer with the nearby Town of Cramerton, called the Parnells to warn that one of the bank robbers had

---

[2]Citations herein to "J.A.___" refer to the contents of the Joint Appendix filed by the parties in this appeal.

been seen in the area. After repeatedly receiving a busy signal or no answer, Smith walked to the Parnell house, knocked, and rang the door bell. When no one answered, he returned home. Smith's efforts nonetheless prompted Whitfield to end his phone call with Sanders and flee the Parnell home through its back door. Whitfield was soon discovered hiding nearby, and he was arrested.

When Herman Parnell returned home through the back door that Whitfield had left ajar, he found his wife motionless, sitting in a chair at his desk in the computer room. Although Mr. Parnell sought to resuscitate Mrs. Parnell and called 911 for assistance, she was never revived and was pronounced dead, having suffered a heart attack. During Whitfield's questioning by the police on the evening of September 26 and the early morning of September 27, he signed two statements confessing to the Belmont home break-ins and another statement confessing to the attempted robbery of the credit union.

B.

1.

On January 23, 2009, the grand jury in Charlotte returned a four-count indictment against Whitfield and McCoy, charging them with attempted bank robbery, in contravention of 18 U.S.C. §§ 2113(a) and 2 (Count One); conspiracy to carry a firearm during an attempted bank robbery, in violation of 18 U.S.C. § 924(o) (Count Two); and carrying a firearm during an attempted bank robbery, in contravention of 18 U.S.C. §§ 924(c) and 2 (Count Three). Count Four, naming Whitfield only, charged him with violating 18 U.S.C. § 2113(e), which provides, in relevant part, that

> [w]hoever, . . . in avoiding or attempting to avoid apprehension for the commission of [any] offense [defined in this section], . . . kills any person, or forces any person to accompany him without the

consent of such person, shall be imprisoned not less than ten years, or if death results shall be punished by death or life imprisonment.

18 U.S.C. § 2113(e).

As discussed further *infra*, § 2113(e) encompasses three alternative offenses pertinent to this case — penalizing a defendant who, in evading apprehension for an attempted bank robbery: (1) "kills any person" (the "killing offense"); or (2) "forces any person to accompany him without the consent of such person" (the "forced accompaniment offense"); or (3) "forces any person to accompany him without the consent of such person" and "death results" (the "death results offense").[3] Count Four of the indictment, however, alleged only two of the three alternative offenses, charging:

> LARRY WHITFIELD did knowingly enter and attempt to enter Fort Financial Credit Union . . . with intent to commit therein a felony affecting that credit union, in violation of 18 U.S.C. § 2113(a), . . . as set forth in COUNT ONE of this Indictment; and in avoiding or attempting to avoid apprehension for said offense, forced M.P. to accompany him without her consent, and killed M.P.

J.A. 14. Thus, the allegations of Count Four were limited to the first and second alternative § 2113(e) offenses — the killing offense and the forced accompaniment offense — and failed to include the third, the death results offense.

On September 16, 2009, Whitfield moved to dismiss Count

---

[3]In these circumstances, the forced accompaniment offense is a lesser included offense of the death results offense, in that the elements of the former "must be included within but not, on the facts of the case, be completely encompassed by the greater" death results offense. *See Sansone v. United States*, 380 U.S. 343, 350 (1965).

Four of the indictment, asserting that § 2113(e) was unconstitutionally vague and that the killing offense could only be properly charged if the prosecution were required to prove that Whitfield intentionally caused the death of Mrs. Parnell. The government opposed the dismissal motion and argued the elementary principle that it had "charged 'killing' and 'forced accompaniment' in the conjunctive, but [was entitled to] prove them in the disjunctive." *See* J.A. 23. The government also proposed that the word "kills" in § 2113(e) be understood from its basic dictionary definition, which does not require specific intent, and invoked the statute's (unindicted) "if death results" provision as reinforcement of such a meaning. *See id.* at 30-31. On October 21, 2009, the district court validated the constitutionality of § 2113(e) and denied Whitfield's motion to dismiss Count Four.

2.

On October 9, 2009, about five weeks before trial, Whitfield moved to suppress his post-arrest confessions to the two Belmont home break-ins and the attempted bank robbery. Whitfield's confessions to the Belmont home break-ins had been elicited during what the district court would designate as the "first part" of the police interview, while the attempted bank robbery confession had been obtained at the conclusion of the "second part" of the interview.

On November 9, 2009, the court conducted an evidentiary hearing on the suppression motion, receiving evidence from Gastonia Police Detective Tony Wilson and Gaston County Police Detective Michael Sumner. Following argument from counsel, the court orally denied Whitfield's motion. In so ruling, the court observed that it had reviewed the video recording of the two-part interview and listened carefully to the evidence of the detectives, which it found "credible." *See* J.A. 172. From the evidence, the court perceived that Whitfield, though "very young, and less experienced," was "conversational," "comfortable," and "intelligent" enough to be "capa-

ble of deciding when to provide information and when not to." *Id.* at 173. Accordingly, the court concluded that, based on "the totality of circumstances," Whitfield's "will was not overborne," and "[t]hat the statements he made were not in violation of the Constitution." *Id.* at 173-74. An order denying Whitfield's motion to suppress was entered the day of the hearing.

Whitfield's jury trial began a week later, on November 16, 2009, in Charlotte. The prosecution presented several witnesses on the first day thereof, including credit union tellers and codefendant McCoy, who testified to his and Whitfield's involvement in the attempted bank robbery and getaway.[4] The second-day witnesses included Gaston County Police Detective William Sampson and other investigating officers. During its examination of Sampson regarding the first part of Whitfield's post-arrest interview, the prosecution introduced Whitfield's confessions to the two Belmont home break-ins, as well as a transcript primarily consisting of the first part of the interview. Before Sampson could testify concerning the second part of the interview, however, the trial court elected to begin the defense's cross-examination of Sampson — deferring Sampson's direct testimony about Whitfield's confession to the attempted bank robbery. The second day of trial concluded after the prosecution's examination of Tamecia Sanders.

When the trial commenced the next morning, the district court explained that Sampson's trial testimony warranted further analysis of whether Whitfield had voluntarily confessed to the attempted bank robbery. The court then delayed the trial proceedings to conduct another suppression hearing — outside the presence of the jury — regarding the second part of Whitfield's post-arrest interview. After hearing further evi-

---

[4]Pursuant to a plea agreement, McCoy had pleaded guilty to Counts One and Three on May 26, 2009. He was sentenced on February 19, 2010, to eighty-four months in prison.

dence and argument, the court suppressed Whitfield's confession to the attempted bank robbery because it had been "coerced," such that his "will was overborne, and his capacity for self-determination [was] critically impaired." J.A. 738.

Memorializing the ruling made at the second suppression hearing, the district court, nearly a year thereafter, entered an order confirming that the attempted bank robbery confession was inadmissible and so amending its contrary November 9, 2009 order. *See United States v. Whitfield*, No. 3:09-cr-00009 (W.D.N.C. Oct. 27, 2010) (the "Suppression Order").**[5]** The court's findings of fact relating to Whitfield's confessions to the home break-ins and the attempted bank robbery are summarized below — supplemented to a limited extent by the interview transcript.

a.

After Whitfield's arrest on September 26, 2008, which occurred at approximately 6:00 p.m., he was detained at the Gastonia Police Department. Gaston County Detectives Sumner and Sampson questioned Whitfield initially, beginning at approximately 7:30 p.m. As Whitfield had been outside in the rain, he "was cold, wet, and visibly shaking for some of the interview." Suppression Order 2. Before questioning Whitfield, Sampson gave *Miranda* warnings, explaining "that it was 'no big deal'" and would be "just like [Whitfield] had 'seen on T.V.'" *Id.* Consistent with established procedure, Sampson provided Whitfield a copy of the *Miranda* warnings and requested that he initial each of them. Sampson directed Whitfield to initial the sheet without inquiring whether he understood his rights, except for the right to remain silent. Sampson read Whitfield a concluding summary of his *Miranda* rights and, instructing Whitfield to sign, asked, "'Is that cool, Larry?'" *See id.* at 3.

---

**[5]**The Suppression Order is found at J.A. 1370-82.

At the outset, "Detectives Sampson and Sumner led [Whitfield] to believe that their interest in questioning him was limited to [the two Belmont home break-ins]." Suppression Order 2. The detectives explained that, as members of the Gaston County Police, "their jurisdiction only covered the break-ins," and they were not concerned with what happened in another jurisdiction, i.e., the attempted bank robbery in Gastonia. *Id.* at 3. Or, as one of the detectives put it, they were interested in the "'lesser of the evils.'" *Id.* "In reality," however, the detectives aimed to acquire enough information "to charge [Whitfield] with attempted bank robbery, kidnapping of [Mrs. Parnell], and, because she had subsequently died of a heart attack, first degree felony-murder." *Id.* at 2. After the detectives questioned Whitfield "aggressively," he confessed to the two break-ins, explaining that he had entered the Parnell home from its back door, but had not interacted with Mrs. Parnell because she was asleep in the computer room. *See id.* at 3. At approximately 8:35 p.m., Whitfield signed a written statement to that effect. Both detectives expressed their appreciation for Whitfield's "forthrightness," and they took a brief break. *See id.*

When Detectives Sampson and Sumner returned, they continued questioning Whitfield about the break-in at the Parnell home. The detectives were at times joined by Gaston County Police Sergeant Chris Reynolds. At one point, Sergeant Reynolds encouraged Whitfield, advising him that "you're doing nothing but helping yourself" by volunteering information, and falsely stating that Mrs. Parnell had "ID'd" Whitfield. *See* J.A. 1296. Eventually, Whitfield admitted that he had entered the Parnell home through its front door — rather than the back door — and that Mrs. Parnell was awake when he encountered her inside the home. Whitfield emphasized that he told Mrs. Parnell that he had "no weapons and [was] not [t]here to hurt [her]," but "just need[ed] somewhere to stay." *Id.* at 1312.

With respect to why Mrs. Parnell was later found in the computer room, Whitfield initially admitted that he had

"guide[d] her to the . . . office" but then appeared to retract that statement, explaining:

> [L]ike I didn't, no. I didn't . . . . I just know, she, she was in front of me and she went into the computer room. I don't remember to-, I really don't remember touching her. Like come on ma'am . . . . I was cooperative with her and she was cooperative with me. I didn't put my hands on her.

J.A. 1312-13. Whitfield stated that he "asked her . . . where [they] could go where [the police] wouldn't . . . see," and that he and Mrs. Parnell "just took . . . the first room [i.e., the computer room]. . . . I was like right here." *Id.* at 1315. When Mrs. Parnell later emerged from the computer room insisting that Whitfield leave, he "asked her to go into the computer room," and also asked "where could [they] go in the house where the police couldn't see," at which point "[Mrs. Parnell] sat down in the chair [in the computer room]." *Id.* at 1317.

At 9:07 p.m., Whitfield signed a second written statement, correcting his first statement by admitting that he had entered the Parnell home through the front door and had interacted with Mrs. Parnell. In its Suppression Order, the district court confirmed its previous ruling of November 9, 2009, that the "inculpatory statements made by [Whitfield regarding the two Belmont home break-ins were] knowingly and voluntarily made." Suppression Order 1 n.2.

b.

After Whitfield signed his statements confessing to the Belmont home break-ins, "the tone of the interrogation suddenly changed." Suppression Order 3. During the first part of their interview of Whitfield, neither Detective Sumner nor Detective Sampson asked Whitfield about his reasons for fleeing from the police. Following "[Whitfield's] initial cooperation, however, Sampson and Sumner began to focus on the bank

robbery, telling [him] they wanted to '[g]et everything together, stack it up . . . [and] get it all over with.'" *Id.* As the district court found, "Sumner and Sampson's questioning became leading, mounting an assault on [Whitfield's] repeated denials of his involvement in the attempted bank robbery with an arsenal of both real and fabricated evidence." *Id.* Despite the detectives' warnings to Whitfield that his case would be "hopeless if it were ever brought before a jury" and that "his charges could be mitigated if he would only cooperate instead of holding out and acting like a 'thug,'" Whitfield continued to deny any involvement in the attempted bank robbery. *Id.* at 4.

At approximately 9:55 p.m., Detectives Sumner and Sampson notified Whitfield that he would be transported to a Gaston County detention facility and then formally charged. Gastonia Detectives Wilson and McSwain, however, then questioned Whitfield for another hour or so. According to the court, Wilson and McSwain followed Sumner and Sampson's tack, "intend[ing] to convince [Whitfield] that his only chance to salvage his otherwise 'bright future' was to confess to the attempted bank robbery." Suppression Order 4. Whitfield, however, refused to admit he had been involved in that offense, finally prompting Wilson to urge Whitfield to "'be righteous. . . . Tell me what happened today and we both walk out of here.'" *Id.* at 5. Whitfield "attempted to end the interrogation by saying 'I can't say no more. But I'm gonna plead, just plead my case that I got against me.'" *Id.* Detective Wilson persisted, however, until he realized that Whitfield was unlikely to confess. Whitfield was then transported to the Gaston County jail.

After arriving at the jail at approximately 12:15 a.m. on September 27, 2008, Detective Sampson read Whitfield the arrest warrant that had been issued against him, which charged kidnapping, breaking and entering, and first degree murder. Realizing he was being charged with murder, Whitfield "looked at [Sampson and Sumner] and asked, 'What can

I do to help myself?'" Suppression Order 6. At that point, Sampson believes that "he clarified [Whitfield's] intent to reinitiate the interrogation by asking if [Whitfield] was sure that he wanted to talk." *Id.* Sampson and Sumner again "Mirandized" Whitfield, who wrote "yes" beside each statement of his rights. Thereafter, Whitfield signed his confession to the attempted bank robbery.

In its Suppression Order, the district court explained that "the coercive nature of the preceding interrogation, Sampson's mediocre reading of [Whitfield's] *Miranda* rights, and the fact that the presentation of [Whitfield's] charges was an attempt to elicit his confession rather than a standard booking procedure," inevitably led to the conclusion that Whitfield did not "re-initiate[ ] questioning at the presentment of his charge by asking "'What can I do to help myself?'" Suppression Order 11-12. Nor did the "break in time and location resulting from [Whitfield's] transport to the Gaston County Jail" dissipate the coercion. *Id.* at 12. "Based upon the totality of circumstances," therefore, the court suppressed Whitfield's attempted bank robbery confession, finding that it was "involuntary" and "inadmissible under 18 U.S.C. § 3501." *Id.*

3.

After the district court's mid-trial evidentiary hearing and suppression of Whitfield's confession to the attempted bank robbery, the proceedings resumed. Although the prosecution had not completed its case by the end of the third day of trial, the court conducted a charge conference. Much of that conference dealt with the issues relating to 18 U.S.C. § 2113(e) and Count Four's allegations. Notably, the government's proposed instruction on Count Four tracked the language of the indictment, referencing only the killing offense and the forced accompaniment offense, as follows:

> COUNT FOUR requires you to determine whether the defendant killed the victim, M.P., or whether the

defendant forced the victim, M.P., to accompany him, while the defendant was attempting to avoid apprehension for the bank robbery charged in COUNT ONE.

J.A. 207. Acting sua sponte, the court presented an instruction directing the jury to consider the unalleged third alternative offense, i.e., the death results offense. In objecting to the court's instruction on Count Four, Whitfield pointed out that the grand jury had failed to allege the death results offense — charging only that Whitfield had forced Mrs. Parnell to accompany him without her consent and killed her. Therefore, according to Whitfield, the court's instruction and the Count Four allegations "do not match." *See id.* at 932. The court overruled the objection, explaining that the "death results" language did not need to be alleged because "the general reference of 2113(e) [in Count Four] triggers the instruction in . . . the [two] ways 2113(e) can be violated," i.e., "either by killing Mary Parnell or[ ] by knowingly forcing her to accompany him." *Id.* at 932-33. Moreover, the court explained that "if it's the latter," i.e., forced accompaniment, there would be "two different ramifications. . . . One is forced accompaniment without death, and [the other is] forced accompaniment with death, and those have sentencing implications." *Id.* at 934-35.

The prosecution rested its case on the fourth day of trial after calling experts to testify about the nature and cause of Mrs. Parnell's death. Whitfield then moved for judgment of acquittal on Count Four, asserting that there was insufficient evidence to support a finding of guilt on that charge, because there was no evidence that he had killed Mrs. Parnell and there was no way to exclude other possible causes of her death. Whitfield also maintained that there was insufficient proof that he had "forced Mrs. Parnell to accompany him anywhere, or that such forced accompaniment caused her death." J.A. 1087. The court promptly denied the motion for acquittal, and, after calling a single witness — his own medical expert

— Whitfield also rested. There was no rebuttal evidence. At that point, Whitfield renewed his motion for judgment of acquittal on Count Four, contending again that there was insufficient evidence to prove that his conduct proximately caused Mrs. Parnell's death. The court again denied the motion.

After the parties made their closing arguments, the district court charged the jury. As to Count Four, the court instructed that, in order for the jury to find Whitfield guilty, it had to be convinced beyond a reasonable doubt that:

> One, the defendant committed the offense alleged in Count One; that is attempted robbery of a credit union.

> Two, in avoiding or attempting to avoid apprehension for that offense, the defendant

> A, killed Mary Parnell.

> Or B, knowingly forced Mary Parnell to accompany him without her consent.

J.A. 1241. The court explained to the jury that Whitfield was "charged with violating this statute in two ways," and that the jury "must consider both whether the defendant killed Mary Parnell and/or whether he forced her to accompany him in avoiding or attempting to avoid apprehension for the attempted robbery." *Id.* at 1241-42. Significantly, the court then instructed the jury that,

> [w]ith respect to the second way of violating this statute, if you find that the defendant forced Mary Parnell to accompany him, *you must also decide whether that forced accompaniment resulted in Mary Parnell's death.*

*Id.* at 1242 (emphasis added).

Other Count Four instructions advised the jury that "the term 'forced accompaniment' includes[ ] forcing a person to move from one part of a building to another against her will" and "does not require . . . that the defendant crossed a property line, moved a person a particular number of feet, held a person for a particular period of time, or placed the person at a certain level of danger." J.A. 1242-43. Regarding the terms "'killed'" and "'resulted in death,'" the court clarified that the government was "not required to prove that the defendant intended to kill Mary Parnell," but that the evidence was required to "prove that the defendant's actions in avoiding or attempting to avoid apprehension, were the proximate cause of her death," i.e., that Whitfield's conduct played "a substantial part in bringing about or actually causing the death of [Mrs. Parnell]." *Id.* at 1243.

During its deliberations, the jury asked several questions concerning Count Four, including inquiries concerning the issue of forced accompaniment and the definitions of "killed" and "resulted in death." When the court convened to discuss the jury's inquiries, Whitfield's counsel repeated his objection to the "entirety of the instruction[s]" on Count Four and specifically objected to the proposed "proximate cause instruction" on the "resulted in death" jury question. *See* J.A. 1259, 1265. The court responded that Whitfield had "not waiv[ed] any [earlier] objection," and that the court's rulings were "the law of the case now." *See id.* at 1259. Nevertheless, the court overruled Whitfield's objections and, in response to the jury's inquiries, referred it to the earlier instructions.

On November 20, 2009, the jury returned a verdict of guilty against Whitfield on Counts One through Three. On Count Four, the jury answered the verdict form's three-part inquiry as follows:

- Paragraph 4.a: "Not Guilty" on the 28 U.S.C. § 2113(e) charge of "killing Mary Parnell in

avoiding or attempting to avoid apprehension for [the attempted bank robbery] alleged in Count One";

- Paragraph 4.b: "Guilty" on the § 2113(e) charge of "forcing Mary Parnell to accompany him in avoiding or attempting to avoid apprehension for [the attempted bank robbery] alleged in Count One"; and

- Paragraph 4.c: "Yes" to the question "did the forced accompaniment result in Mary Parnell's death?"

*See* J.A. 1270, 1340.[6] Following the jury's return of its verdict, Whitfield renewed his "earlier objection made during the charge conference, in that the language given to the jury is inconsistent with the charging documents, and that resulted in prejudice." *See id.* at 1274-75. The court overruled the objection.

On November 10, 2010, the district court sentenced Whitfield to life imprisonment on Count Four, which the court deemed to be "statutorily required." *See* J.A. 1625-26.[7] The court also imposed concurrent 240-month sentences on Counts One and Two, plus a consecutive sixty-month sentence on Count Three. The court entered judgment on November 29, 2010, providing that, with respect to Count Four, Whitfield had been found guilty and was sentenced on the death results offense — that is, as the judgment recited,

---

[6]As the verdict form somewhat confusingly recited, a response to Paragraph 4.c was only necessary if the answer to Paragraph 4.b was "yes." The only possible answers to Paragraph 4.b, however, were "Guilty" and "Not Guilty." *See* J.A. 1340.

[7]Section 2113(e) of Title 18 authorizes a mandatory life sentence or the death penalty as punishment for the killing offense (on which the verdict was "Not Guilty"), as well as for the unindicted death results offense. The government, however, elected prior to trial not to seek the death penalty.

"[f]orced accompaniment while attempting to avoid apprehension for an attempted bank robbery resulting in death." *Id.* at 1632. Whitfield has timely appealed, and we possess jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## II.

On appeal, Whitfield presents four contentions of error. First, Whitfield faults the district court for declining to suppress his confessions to the two Belmont home break-ins, which he argues were the product of coercive interrogations and thus involuntary. Second, he posits that two aspects of the jury instructions on Count Four regarding the forced accompaniment offense were plainly erroneous, in that they failed to instruct on a lesser-included offense and permitted the jury to convict on Count Four for a mere confinement (as opposed to a forced accompaniment). Third, Whitfield maintains that the court erred in instructing the jury on the death results offense not alleged in Count Four. Finally, Whitfield asserts that there was insufficient evidence to support his conviction on the forced accompaniment offense. We assess Whitfield's contentions in turn.

## A.

Whitfield first contends that the district court erred by declining to suppress his confessions to the two Belmont home break-ins, especially the statements about his encounter with Mrs. Parnell. Whitfield agrees, of course, that the court properly suppressed his confession to the attempted bank robbery (a ruling not challenged by either party on appeal). He nevertheless maintains that his other two confessions should have been suppressed because the officers used coercive tactics in the interview process. In particular, Whitfield points out that, at the outset of the interview, "Detectives Sampson and Sumner led [Whitfield] to believe that their interest in questioning him was limited to [the two Belmont home break-ins]" — the "'lesser of the evils'" — not the forced accompa-

niment and death of Mrs. Parnell or the attempted bank robbery. *See* Suppression Order 2-3. Indeed, the court found that Whitfield "was misled throughout his interrogation regarding the seriousness of the charges against him." *Id.* at 8. Whitfield also emphasizes that he was "especially vulnerable to the [detectives'] coercive interrogation tactics," because, as the court observed, "[w]hen his questioning began, [Whitfield] was cold, wet, only 20 years' old, and had never before faced any serious charges." *Id.* at 9-10.

In considering whether a defendant's inculpatory statement was voluntary, we "must make an independent determination on the issue of voluntariness, [and accept] the district court's findings of fact on the circumstances surrounding the confession . . . unless clearly erroneous." *United States v. Khan*, 461 F.3d 477, 497 (4th Cir. 2006) (internal quotation marks omitted). In undertaking that review, we must specifically "determine whether the confession was extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence." *United States v. Holmes*, 670 F.3d 586, 591 (4th Cir. 2012) (alterations and internal quotation marks omitted). "Even where threats, violence, implied promises, improper influence, or other coercive police activity exist," however, a confession may yet be voluntary unless "the defendant's will has been overborne or his capacity for self-determination critically impaired." *Id.* (internal quotation marks omitted). In that regard, we examine "the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." *Id.* at 592 (internal quotation marks omitted).

To begin with, we are struck by the district court's perceptive and sensible differentiation between the two parts of the post-arrest interview of Whitfield. In stark contrast to the second part — which the court deemed "embarrassing to law enforcement" and "extremely coercive," J.A. 731 — "the first part of that interview was [the] kind of police conduct that . . .

is entirely appropriate, aggressive, trying to ferret out the truth of evidence of criminal activity," *id.* at 730. Although there were some "fairly minor discrepancies" in the detectives' testimony, the court specifically found them to be "credible" and their evidence "consistent[ ] and corroborated by the DVD of the interview." *Id.* at 172. Moreover, the court found that, during the first part of the interview, Whitfield was "conversational"; was "comfortable," though wet and cold; and, despite his youth and inexperience, generally "seemed intelligent" enough to decide "when to provide information and when not to." *Id.* at 173. Notably, Whitfield has not argued — nor do we perceive — that any of the court's factual findings were clearly erroneous. We are therefore bound to accept those findings. *See United States v. Braxton*, 112 F.3d 777, 781 (4th Cir. 1997) (observing that we "accept[ ] the district court's findings of fact on the circumstances surrounding the confession . . . unless clearly erroneous" (internal quotation marks omitted)).

Whitfield's chief complaint is that the police officers deceived him about the offenses they were investigating, particularly those involving the forced accompaniment and death of Mrs. Parnell. Nevertheless, Whitfield concedes that the officers "had no duty to advise [him] of the identity of the specific offense under investigation" or "inform [him] of every potential theory of liability related to [his] conduct." *Braxton*, 112 F.3d at 784. Although Detectives Sampson and Sumner led Whitfield to believe that their only interest at the start of the interview was the Belmont home break-ins, Whitfield obviously knew that his interactions with Mrs. Parnell were the result of his breaking and entering of her home. Whitfield persists, however, that he could not have rationally assessed the consequence of confessing to the break-ins because Sergeant Reynolds had indicated that Mrs. Parnell was alive and had "ID'd" Whitfield. *See* J.A. 1296. Because of Reynolds' misrepresentations, Whitfield contends that he mistakenly believed that he was being investigated for only a minor crime.

As the Supreme Court has explained, "[p]loys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns." *Illinois v. Perkins*, 496 U.S. 292, 297 (1990). Indeed, "misrepresentations are insufficient, in and of themselves, to render a confession involuntary." *Johnson v. Pollard*, 559 F.3d 746, 755 (7th Cir. 2009) (collecting cases); *accord Braxton*, 112 F.3d at 782-83 (concluding that investigator's statement "that you can do five years because you're not coming clean," did not result in involuntary confession). The determinative factor remains the question of whether such misrepresentations overbore the defendant's will. *See Frazier v. Cupp*, 394 U.S. 731, 739 (1969) ("[T]he fact that the police misrepresented the statements that [the co-defendant] had made is, while relevant, insufficient . . . to make this otherwise voluntary confession inadmissible."). Put simply, we are satisfied — as was the district court — that Whitfield's capacity for self-determination was not critically impaired by Sergeant Reynolds's misrepresentations.[8]

As a result, the totality of the circumstances support the district court's denial of suppression. During the first part of the police interview, Whitfield's statements pertaining to the two Belmont home break-ins — including his statements about interacting with Mrs. Parnell — were voluntarily made. *Cf. United States v. Byers*, 649 F.3d 197, 216 (4th Cir. 2011)

---

[8]We are also satisfied that Whitfield's will was not overborne by Sergeant Reynolds encouraging him to talk, suggesting that Whitfield would do "nothing but help[ ] [himself]." *See* J.A. 1296. Contrary to Whitfield's assertions, Reynolds' vague, nondescript encouragement did not misrepresent the legal effect of confessing to his interactions with Mrs. Parnell. *See Rose v. Lee*, 252 F.3d 676, 686 (4th Cir. 2001) ("declin[ing] to hold that the cryptic promise that 'things would go easier' on [defendant] if he confessed amounts to unconstitutional coercion"); *see also United States v. Rutledge*, 900 F.2d 1127, 1128 (7th Cir. 1990) (concluding that confession was voluntary where police made "not quite truthful" statement that "'all cooperation is helpful,'" though confession actually exposed defendant to heavier sentence).

(ruling that defendant's confession was not coerced, even though "detective's statements were somewhat equivocal," because, inter alia, defendant received *Miranda* warnings and police never told defendant he would not be charged with murder); *United States v. Gray*, 137 F.3d 765, 771 (4th Cir. 1998) (same, where defendant "initialed his understanding of each of his [*Miranda*] rights and signed a form indicating that he understood"; no law enforcement officer made "assurances, promises or inducements" to convince defendant that he "would in any way be immunized"; and there was no evidence that the officers had "engaged in any threats, violence, or improper suggestions about how [defendant's] testimony would be used").

B.

Whitfield next contends that the instructions on the forced accompaniment offense were plainly erroneous in two respects. First, he argues that the district court failed to instruct on a lesser-included offense, and, second, that the instructions permitted the jury to convict on a theory of mere confinement as opposed to an actual forced accompaniment. As Whitfield acknowledges, we must review these contentions for plain error because they are raised for the first time on appeal. *See United States v. Robinson*, 627 F.3d 941, 953 (4th Cir. 2010). To satisfy the plain error standard, a defendant "must establish that the district court erred, that the error was plain, and that it 'affected his substantial rights.'" *Id.* at 954 (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)) (alterations omitted). Even if those three prerequisites are met, "we retain discretion to deny relief; plain errors should only be corrected where not doing so would result in a miscarriage of justice, or would otherwise seriously affect the fairness, integrity or public reputation of judicial proceedings." *Id.* (alterations, citations, and internal quotation marks omitted). In any event, "[w]e review for abuse of discretion both the district court's decision to offer an instruction and the

content of that instruction." *United States v. Jinwright*, 683 F.3d 471, ___ (4th Cir. 2012).

1.

First, Whitfield asserts that the district court plainly erred in failing to instruct the jury that a conviction under § 2113(e) for forced accompaniment (with or without a resulting death) requires proof of a predicate § 2113(d) violation.[9] We have recognized § 2113(d) as a "lesser included offense" of the § 2113(e) offenses, such that "[a]ll of the elements required under § 2113(d) are elements under § 2113(e)." *United States v. Turner*, 389 F.3d 111, 121 (4th Cir. 2004); *accord United States v. Whitley*, 759 F.2d 327, 331 (4th Cir. 1985) (en banc). Nevertheless, the government maintains that no error occurred — much less a plain error — in that the lesser-included-offense instruction is not supported by the terms of § 2113(e) and does not fit the unique facts of this case. We need not reach or decide those points, however, because even if the court abused its discretion by failing to instruct on § 2113(d), and even if that assumed error was plain, it neither contravened Whitfield's substantial rights nor warrants the exercise of our discretion to correct it.[10]

As Whitfield acknowledges, an instructional error is harmless in circumstances where "the jury actually made an equivalent or identical finding pursuant to another instruction." *See United States v. Aramony*, 88 F.3d 1369, 1387 (4th Cir. 1996).

---

[9]Section 2113(d) punishes the "use of a dangerous weapon or device" to "assault[ ] any person or put[ ] in jeopardy the life of any person" during the commission or attempted commission of a bank robbery.

[10]Absent a superseding decision of the Supreme Court or our en banc Court, we cannot, in any event, revisit whether *Whitley* and *Turner* properly characterized § 2113(d) as a lesser included offense of § 2113(e). *See United States v. White*, 670 F.3d 498, 516 (4th Cir. 2012) (recognizing that "a panel of this court cannot overrule, explicitly or implicitly, the precedent set by a prior panel of this court" because that authority is vested in "the Supreme Court or this court sitting en banc").

By its guilty verdicts on Counts One through Three, the jury in this case found, inter alia, that Whitfield entered the credit union intending to commit a felony therein, namely, "taking [the credit union's money] from the person or presence of another, by force, violence, and intimidation," and that he then carried "a Smith & Wesson .357 caliber revolver and a CN Romarm 7.62x39 caliber assault rifle . . . in furtherance of [a] crime of violence." *See* J.A. 12-14, 1339. Such underlying conduct amply supports the proposition that, as required by § 2113(d), Whitfield used "a dangerous weapon" to "assault[ ] [a] person or put[ ] in jeopardy the life of [a] person" during an attempted bank robbery. Indeed, we have long recognized that the act of "[b]randishing weapons during a robbery threatens victims and bystanders alike," sufficient to support a conviction under § 2113(d). *See United States v. Bennett*, 675 F.2d 596, 599 (4th Cir. 1982); *see also United States v. Harris*, 792 F.2d 866, 868 (9th Cir. 1986) (affirming convictions under 18 U.S.C. §§ 924(c) and 2113(d) where evidence established that defendant carried firearm during bank robbery).[11] As a result, we are satisfied that, even if a plain instructional error occurred, it did not "affect[ ] [Whitfield's] substantial rights." *See* Fed. R. Civ. P. 51(d)(2); *Olano*, 507 U.S. at 734.

Furthermore, even if Whitfield had been prejudiced by a plain instructional error, we would not exercise our discretion to notice the error. As we have explained, "central to the ques-

---

[11]Whitfield contends that, because the credit union's lobby doors were locked and bulletproof, he had no "apparent present ability" to assault anyone and the credit union's employees had "no reason to fear or expect immediate bodily harm." *See United States v. Newkirk*, 481 F.2d 881, 883 n.1 (4th Cir. 1973). We will not speculate on whether the lobby doors and bulletproof glass were completely impenetrable or would have yielded had Whitfield and McCoy opened fire. Instead, we join the Second and Eleventh Circuits in rejecting the contention that bank tellers are not jeopardized simply because they are situated behind "bulletproof" glass. *See United States v. Tutt*, 704 F.2d 1567, 1568-69 (11th Cir. 1983); *United States v. Johnson*, 401 F.2d 746, 747 (2d Cir. 1968).

tion of whether to notice a plain error affecting substantial rights is a determination of whether, based on the record in its entirety, the proceedings against the accused resulted in a fair and reliable determination of guilt." *United States v. Cedelle*, 89 F.3d 181, 185 (4th Cir. 1996). Based on the trial evidence — including Whitfield's confessions — the jury found that he forced Mrs. Parnell to accompany him without her consent. The evidence showed further that Mrs. Parnell reasonably feared Whitfield, and that Whitfield attempted to commit an aggravated armed bank robbery. In these circumstances, the failure to correct the assumed instructional error would not result in a miscarriage of justice or undermine the fairness or integrity of the trial proceedings. Rather, "it would be the reversal of a conviction such as this which would have that effect." *Johnson v. United States*, 520 U.S. 461, 470 (1997); *cf. Cedelle*, 89 F.3d at 186 (declining to correct trial court's error in failing to instruct jury on essential element because evidence "permit[ted] no other conclusion" but that defendant was guilty).

2.

Second, Whitfield contends that the district court plainly erred in failing to instruct the jury on the requirements of "a literal[ ] forced accompaniment" under § 2113(e). *See Turner*, 389 F.3d at 120. More specifically, Whitfield argues that the court erred by instructing that the § 2113(e) forced accompaniment offense "includes" such an accompaniment, rather than "requires" it. Whitfield also takes issue with the court's instruction that the jury need not find "that the defendant . . . *held* the person for a particular period of time," *id.* at 1242-43 (emphasis added), because that instruction suggests that a mere confinement is sufficient — a suggestion that the prosecution availed itself of by emphasizing in closing that Mrs. Parnell had been "held against her will," *see id.* at 1202-03.

We perceive no error in the district court's use of the word "includes" in its instruction on the meaning of forced accom-

paniment. A trial court has "considerable discretion in choosing the specific wording of [its] instructions," and we will not reverse unless an instructional error "is determined to have been prejudicial, based on a review of the record as a whole." *Figg v. Schroeder*, 312 F.3d 625, 640 (4th Cir. 2002) (internal quotation marks omitted). That is, "we do not view a single instruction in isolation; rather we consider whether taken as a whole and in the context of the entire charge, the instructions accurately and fairly state the controlling law." *United States v. Rahman*, 83 F.3d 89, 92 (4th Cir. 1996). On the whole, the contested instruction — advising the jury that "the term forced accompaniment includes[ ] forcing a person to move from one part of the building to another against her will" — accurately sets forth the applicable law. *See* J.A. 1242. This instruction was appropriately contextualized to the facts of this case and, by employing the word "includes," fairly conveys that, although a defendant can force a person to accompany him "beyond the walls of [a building]," movement "from one part of the building to another" without consent is "literally" a forced accompaniment — consistent with our recognition that "§ 2113(e) includes no property-line or threshold requirement." *See Turner*, 389 F.3d at 119-20.[12]

Finally, we do not fault the district court for advising the jury that a forced accompaniment does *not* require that the victim be "held . . . for a particular time period," J.A. 1242, because the instruction contained language we have already approved, *see Turner*, 389 F.3d at 119 ("agree[ing] with the Eleventh Circuit that the text of [§ 2113(e)] contains 'no requirement that . . . she be held against her will for a particular time period'" (alterations omitted) (quoting *United States*

---

[12]In rejecting the *Turner* defendant's contention that "only forcing someone out of a building, or perhaps taking hostages, can trigger the forced accompaniment of § 2113(e)," Judge Wilkinson astutely explained that, although "most forced accompaniments [might] include crossing the threshold[,] Congress can criminalize that which is uncommon, as it did in penalizing forced accompaniments occurring entirely inside [a building such as] a bank." 389 F.3d at 119.

*v. Bauer*, 956 F.2d 239, 241 (11th Cir. 1992))). In any event, the challenged instruction expressly disallows — rather than endorses — a mere confinement theory of forced accompaniment. In the circumstances, there was no instructional error made by the trial court, and this argument must also be rejected.

## C.

Whitfield next contends that his Fifth Amendment right to be indicted by a grand jury was abridged because he was convicted of an offense not charged in Count Four — the death results offense. In essence, Whitfield asserts that the manner in which Count Four was tried, including the court's instructions on "death results" and the derivative verdict form, contravened the Grand Jury Clause by constructively amending Count Four.[13] We review de novo the legal question of whether there has been a constructive amendment of an indictment. *See United States v. Malloy*, 568 F.3d 166, 177 (4th Cir. 2009).

## 1.

The government has maintained throughout this appeal that Count Four alleged the essential elements of the § 2113(e) offense of which Whitfield was convicted, arguing that the allegations omitted "only an enhancing element ['death results'] that the jury later found but was not used to support a sentence above the otherwise applicable statutory maximum." *See* Br. of Appellee 33.[14] As several courts have

---

[13]The Grand Jury Clause of the Fifth Amendment provides, in pertinent part, that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. amend. V.

[14]The government has nonetheless acknowledged in another court of appeals that "death results" is "an element of a crime separate from bank robbery," and not "a sentencing factor." *See* Final Br. of Appellee at 58,

observed, however, the "death results" terminology in similar criminal statutes prescribes an offense element rather than a sentencing factor.

In *Jones v. United States*, the Supreme Court held that provisions of the carjacking statute, 18 U.S.C. § 2119 — authorizing more severe penalties when the carjacking involves "serious injury" or "death" — establish "separate offenses by the specification of distinct elements" that are not mere sentencing factors. *See* 526 U.S. 227, 251–52 (1999). Relying on *Jones*, we identified "death results" as a separate offense element of § 2119. *See United States v. Blake*, 571 F.3d 331, 351 (4th Cir. 2009). Consistent with *Jones*, we have also recognized that "death resulted" is an essential element of the offense of "kidnapping resulting in death" as defined in 18 U.S.C. § 1201(a), a statute structured similarly to § 2113(e). *See United States v. Lentz*, 524 F.3d 501, 512 (4th Cir. 2008). Our sister circuits have likewise construed analogous "death results" provisions. *See, e.g.*, *United States v. Montgomery*, 635 F.3d 1074, 1087 (8th Cir. 2011) (kidnapping resulting in death, § 1201(a)); *Logan v. United States*, 434 F.3d 503, 508 (6th Cir. 2006) (arson resulting in death, 18 U.S.C. § 844(i)); *United States v. Rebmann*, 321 F.3d 540, 542 (6th Cir. 2003) (drug          trafficking          resulting          in          death,          21          U.S.C.

*United States v. Dorman*, No. 02-5127(L) (6th Cir. July 7, 2003). There, the government repudiated the contrary ruling of *United States v. Nelson*, 920 F. Supp. 825 (M.D. Tenn. 1996), which had concluded that "death results" serves only to enhance the penalty, not create a separate offense. The government further admitted in *Dorman* that *Nelson* was "directly at odds with the Supreme Court's holding in *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)." Final Br. of Appellee at 58-59. Indeed, before the district court here, in opposition to Whitfield's motion to dismiss Count Four, the government vouchsafed — in line with its position in *Dorman* — that the holding in *Nelson* was "perhaps only possible pre-*Apprendi*." *See* J.A. 32. It is difficult to explain the government's retreat on appeal from its long-held position as anything other than a tactical maneuver driven by the exigencies of the tenuous litigation posture in which it finds itself.

§ 841(b)(1)(C)); *United States v. Friedman*, 300 F.3d 111, 127 (2d Cir. 2002) (racketeering violence resulting in death, 18 U.S.C. § 1952); *United States v. Rezaq*, 134 F.3d 1121, 1135-37 (D.C. Cir. 1998) (aircraft piracy resulting in death, 49 U.S.C. § 1472(n)(1)(B)).

We are unable to discern any reason to either interpret or apply § 2113(e) differently in this case. Rather, we are content to adhere to the Supreme Court's nomenclature and describe § 2113(e) as creating "separate offenses by the specification of distinct elements." *See Jones*, 526 U.S. at 252.[15] More specifically, the killing offense requires proof that a defendant "kill[ed] any person." The forced accompaniment offense necessitates proof that a defendant "force[d a] person to accompany him without the consent of such person." And the death results offense — although entailing the lesser-included forced accompaniment offense — requires further proof that "death result[ed]." Hence, by instructing on the uncharged death results offense, the district court constructively amended Count Four to "broaden[ ] the possible bases for conviction beyond those presented to the grand jury." *See United States v. Floresca*, 38 F.3d 706, 710 (4th Cir. 1994)

---

[15]It is no understatement to say that § 2113(e) is less than a model of clarity. The statute has been characterized as "capable of multiple interpretations, none of which is without problems." *See United States v. Parks*, 583 F.3d 923, 928 (6th Cir. 2009) (White, J., concurring). Indeed, § 2113(e) creates a variety of distinct offenses. For example, although evading apprehension for an attempted bank robbery was an element of Whitfield's Count Four conviction, other types of conduct may underlie a § 2113(e) offense. To illustrate, a defendant who, while attempting to rob a bank, shoots and kills a bank guard after a struggle for a gun would be guilty of "kill[ing] any person" in the course of "committing" attempted bank robbery. *See United States v. Bolden*, 545 F.3d 609 (8th Cir. 2008). And, a defendant who compels a bank employee into the bank vault and pressures her to fill a pillowcase with money before leaving her unharmed would be guilty of "forc[ing] any person to accompany him without the consent of such person" while "committing" bank robbery. *See Turner*, 389 F.3d at 119-20. Fortunately, for purposes of this appeal, we need not parse § 2113(e) for all of its conceivable offenses.

(en banc). When such "a constructive amendment is found, the error is fatal and reversible per se." *Lentz*, 524 F.3d at 511.[16]

Of course, not every inconsistency "between an indictment and the proof offered at trial . . . constitute[s] a constructive amendment of an indictment." *United States v. Redd*, 161 F.3d 793, 795 (4th Cir. 1998). Short of a constructive amendment, a mere variance, for example, "occurs when the facts proven at trial support a finding that the defendant committed the indicted crime, but the circumstances alleged in the indictment to have formed the context of the defendant's actions differ in some way nonessential to the conclusion that the crime must have been committed." *Floresca*, 38 F.3d at 709. Such a variance "does not violate a defendant's constitutional rights unless it prejudices the defendant either by surprising him at trial and hindering the preparation of his defense, or by exposing him to the danger of a second prosecution for the same offense." *United States v. Ashley*, 606 F.3d 135, 141 (4th Cir. 2010). Furthermore, an indictment can be amended without further consideration by the grand jury when it is necessary to strike surplusage, *see id.* at 142; *United States v. Ford*, 986 F.2d 57, 59 (4th Cir. 1993), or to correct the indict-

---

[16]At oral argument in this appeal, the government explained that the prosecutors mistakenly believed that it would be redundant for Count Four to allege both "kills" and "death results." This misinterpretation may explain Count Four's awkward inversion of the killing offense and the forced accompaniment offense from the order in which those offenses appear in § 2113(e). As we have explained, however, the killing offense and the death results offense consist of different elements. Otherwise, the Violent Crime Control and Law Enforcement Act of 1994 — which added the "death results" provision to § 2113(e) notwithstanding the preexisting "kills" offense — would have been pointless. And we are unable to so construe a statutory enactment. *See PSINet, Inc. v. Chapman*, 362 F.3d 227, 232 (4th Cir. 2004) (observing that "[g]eneral principles of statutory construction require a court to construe all parts to have meaning and to reject constructions that render a term redundant"). In any event, the government has abandoned the argument that "death results" is subsumed by "kills," as it seeks affirmance of the death results offense conviction even though Whitfield was acquitted of the killing offense.

ment's form, e.g., a misnomer, *see United States v. Snowden*, 770 F.2d 393, 398 (4th Cir. 1985), or a typographical error, *see United States v. Morrow*, 925 F.2d 779, 781 (4th Cir. 1991).

In much the same fashion as it sought to downplay the constructive amendment in *Floresca* as a variance, the government suggested during the oral argument of this case that the Count Four allegations constituted no more than an "indictment error" within the meaning of *Higgs v. United States*, 353 F.3d 281 (4th Cir. 2003). In *Higgs*, we defined an indictment error as "the failure of an indictment to allege an element of a charged offense." *Id.* at 306. After concluding that the indictment was adequate in that case, we went on to observe, albeit in dicta, that any assumed indictment error would nevertheless be subject to harmless error review.

Although the distinction between a constructive amendment and a *Higgs*-type indictment error may be nuanced, the difference is appreciable in this case. Here, there was substantially more than a simple neglect "to allege an element of a charged offense." Indeed, the killing offense and the forced accompaniment offense were properly charged with all of their essential elements and, thus, there was no defect in the Count Four allegations. The error arose not from the indictment's omission of an element of a charged offense but from the district court's instructions on an element of an *uncharged offense* — the death results offense — on which Whitfield "was ultimately convicted and sentenced." *See Higgs*, 353 F.3d at 306 (recognizing practical distinction between indictment error and constructive amendment). The result was an archetypical constructive amendment.

Moreover, it cannot be fairly said that the decision to allege Count Four as it is drawn, specifying only the killing offense and the forced accompaniment offense, was other than intentional. The prosecution's proposed instruction on Count Four was consistent with Count Four's allegations, and did not

mention the death results offense. In addition, while opposing Whitfield's motion to dismiss Count Four, the government correctly emphasized that it had "charged" the two § 2113(e) offenses of "'killing' and 'forced accompaniment' in the conjunctive, but it [was entitled to] prove them in the disjunctive." *See* J.A. 23.[17] Thus, to the extent that the grand jury's charge can be said to have resulted in "indictment error," it was not error premised on a mistake of perception, i.e., an oversight as occurred in *Higgs*, but the prologue to legal error occasioned by the district court's inconsistent instructions.

"To constitute a constructive amendment," the incongruity must in fact "change the elements of the offense charged, such that the defendant is actually convicted of a crime other than that charged in the indictment." *See Ashley*, 606 F.3d at 141. A broadening of the alleged charges is precisely what occurred in this case when the district court instructed the jury on the death results offense. Simply put, an "indictment may not be [so] amended except by resubmission to the grand jury." *Russell v. United States*, 369 U.S. 749, 770 (1962). In deference to the exclusive province of the grand jury to amend the charges in an indictment, "in this circuit constructive amendments are erroneous per se and require reversal regardless of preservation." *United States v. Robinson*, 627 F.3d 941, 958 (4th Cir. 2010) (citing *United States v. Foster*, 507 F.3d 223, 242-43 (4th Cir. 2007); *Floresca*, 38 F.3d at 714). Or, as more succinctly put by our friend Judge Hall, a constructive amendment is "not subject to review for harmlessness." *Floresca*, 38 F.3d at 712.

---

[17]The government's position in that regard was consistent with the structure of § 2113(e), which spells out its separate offenses in the disjunctive ("or"). And, of course, "[i]t is well established that when the Government charges in the conjunctive, and the statute is worded in the disjunctive, the district court can instruct the jury in the disjunctive." *United States v. Perry*, 560 F.3d 246, 256 (4th Cir. 2009). As a result, the killing offense and the forced accompaniment offense were properly charged in Count Four and the court appropriately instructed on those offenses, employing the disjunctive.

2.

Even if this case involved an indictment error subject to harmless error review, we would yet vacate Whitfield's conviction and mandatory life sentence on the death results offense. The government argues that any Fifth Amendment violation was harmless because Whitfield's life sentence "was within the statutory range" and "fully supported by the elements alleged and found by the jury beyond a reasonable doubt." Br. of Appellee 33. As Whitfield correctly observes, however, the government's focus on the sufficiency of the evidence is misplaced, inasmuch as to demonstrate harmlessness in the sentencing context, it "must prove beyond a reasonable doubt that the court would have imposed the same sentence in the absence of the constitutional error." *See United States v. Shatley*, 448 F.3d 264, 267 (4th Cir. 2006); *see also United States v. Mackins*, 315 F.3d 399, 409 (4th Cir. 2003) (reviewing preserved error for harmlessness and concluding that defendant's substantial rights were affected by receiving life sentence when Guidelines mandated ninety-year sentence).

The government simply cannot make the required showing here. The district court believed that it was statutorily mandated to sentence Whitfield to life imprisonment on the death results offense, and the court never indicated that it would have imposed that same sentence had a more lenient alternative been available. In that circumstance, the "sentencing court's silence must be interpreted in favor of [Whitfield]." *See United States v. Rodriguez*, 433 F.3d 411, 416 (4th Cir. 2006) (adjudging preserved statutory *Booker* error as prejudicial where court did not indicate that it might have imposed different sentence if Guidelines were advisory).

Consequently, whether we deem the district court's error a constructive amendment or an indictment error, we reach the same result — vacatur of Whitfield's conviction of the death results offense and the resulting mandatory life sentence. On

remand, the court will be obliged to amend the judgment to reflect Whitfield's conviction on the forced accompaniment offense charged in Count Four, and then resentence him accordingly.[18]

## D.

Finally, Whitfield contends that there was insufficient evidence for the jury to find beyond a reasonable doubt that he forced Mrs. Parnell to accompany him without her consent, within the meaning of the forced accompaniment offense in § 2113(e).[19] In "reviewing a sufficiency-of-the-evidence claim, we will sustain the jury's verdict if there is substantial evidence, taking the view most favorable to the Government, to support it." *United States v. Hackley*, 662 F.3d 671, 683 (4th Cir. 2011) (internal quotation marks omitted). "Substantial evidence," as we have explained, "is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Id.* (internal quotation marks omitted).

Whitfield asserts that the prosecution failed to produce any evidence that he had threatened Mrs. Parnell as a means of forcing her to accompany him and, in the light most favorable to the government, established only that he had "guided" or "asked" her to go into the computer room. We are entirely

---

[18]As reflected on the verdict form, Whitfield was also convicted of the forced accompaniment offense. That conviction stands, being unaffected by the constructive amendment. On remand, the district court must therefore resentence Whitfield on his Count Four conviction of the forced accompaniment offense, which carries a "mandatory minimum of ten years" and "an unstated statutory maximum [that] grants discretion to sentence up to life in prison." *See Turner*, 389 F.3d at 120 (affirming sentence of life imprisonment for forced accompaniment offense without resulting death).

[19]Because we vacate Whitfield's conviction of the death results offense, we need not consider his challenge to the sufficiency of the evidence on that unindicted aspect of this case.

unpersuaded by this argument, and decline to accept that an ostensible "request" by a physically agile twenty-year-old male attempting to evade apprehension for an attempted bank robbery constitutes anything less than a real threat, particularly when aimed at a fragile seventy-nine-year-old woman during a terrifying invasion of her home. Indeed, there was ample evidence that Whitfield wanted to position Mrs. Parnell in the computer room where they could not be seen by the police. Whitfield admitted that he directed Mrs. Parnell to the computer room. And, when she attempted to defy his instructions by insisting that he leave the home, Whitfield required Mrs. Parnell to stay in the computer room, at which point "she sat down in the chair," where she was found dead. J.A. 1460. Although Whitfield required Mrs. Parnell to accompany him for only a short distance within her own home, and for a brief period, no more is required to prove that a forced accompaniment occurred. *See Turner*, 389 F.3d at 119-20 (affirming forced accompaniment conviction where defendant compelled bank manager to accompany him to bank's vault); *cf. United States v. Osborne*, 514 F.3d 377, 390 (4th Cir. 2008) (approving Guidelines abduction enhancement where robber moved employees from back to front of store).[20]

### III.

Pursuant to the foregoing, we vacate Whitfield's conviction and sentence on the uncharged death results offense, and remand for entry of a judgment of conviction on the Count Four forced accompaniment offense and for appropriate

---

[20]Our interpretation of a forced accompaniment comports with the decisions of our sister circuits. *See, e.g.*, *United States v. Strobehn*, 421 F.3d 1017, 1020 (9th Cir. 2005) (affirming forced accompaniment conviction of defendant who forced bank employee to open door and lie face down on floor inside bank); *United States v. Reed*, 26 F.3d 523, 527 (5th Cir. 1994) (same); *Bauer*, 956 F.2d at 241 (11th Cir. 1992) (upholding forced accompaniment conviction for defendant who compelled two people to walk with him from back to front of bank).

resentencing proceedings. We affirm the judgment in all other respects.

*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED*